O

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| **In re HOMESTORE.COM, INC. Securities Litigation** | CASE NO. CV 01-11115 RSWL (CWx) |
| This Document Relates to:<br><br>All Actions | **JOINT FINAL PRETRIAL CONFERENCE ORDER**<br><br>Pre-Trial Conference:  January 11, 2011<br><br>Trial Date:  January 25, 2011 |

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**

# TABLE OF CONTENTS

**Page**

I.     THE PARTIES ............................................................................... 1

II.    FEDERAL JURISDICTION AND VENUE ...................................... 1

III.   TRIAL ESTIMATE ........................................................................ 2

      A.     Plaintiff's Estimate .......................................................... 2

      B.     Mr. Wolff's Estimate ....................................................... 2

IV.    JURY TRIAL ................................................................................ 2

V.     ADMITTED FACTS ...................................................................... 2

      A.     Facts Admitted By CalSTRS ............................................ 2

      B.     Facts Admitted By Mr. Wolff .......................................... 3

VI.    STIPULATED FACTS .................................................................. 3

VII.   CLAIMS AND DEFENSES OF THE PARTIES ............................ 4

      A.     Plaintiff's Claims ............................................................. 4

      B.     Defendant Wolff's Affirmative Defenses ....................... 14

      C.     Third Party Plaintiffs And Defendants ........................... 28

VIII.  REMAINING TRIABLE ISSUES ................................................ 29

IX.    DISCOVERY ............................................................................... 29

X.     TRIAL EXHIBITS ...................................................................... 29

      A.     Plaintiff's Objections ..................................................... 29

      B.     Wolff's Objections ......................................................... 29

XI.    WITNESS LIST ........................................................................... 29

      A.     Plaintiff's Designations .................................................. 29

      B.     Wolff's Designations ...................................................... 30

      C.     Plaintiff's Objections ..................................................... 31

      D.     Mr. Wolff's Objections .................................................. 32

XII.   MOTIONS ................................................................................... 33

      A.     Plaintiff's List of Motions in Limine ............................. 33

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**

i

# TABLE OF CONTENTS
(continued)

**Page**

     B.    Mr.Wolff's List of Motions.........................................................34

XIII. BIFURCATION ........................................................................37

     A.    Defendant Wolff's Statement.................................................37

     B.    Plaintiff's Statement..............................................................38

XIV. STATEMENT OF COMPLIANCE ..................................................39

# TABLE OF AUTHORITIES

1
2

**Page(s)**

3

CASES

4
5

Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co.,
  2000 U.S. Dist. LEXIS 997 (D. Del. Jan. 13, 2000) ..........................................31

6
7

Basic, Inc. v. Levinson,
  485 U.S. 224 (1988)...............................................................15, 37

8
9

Bateman, Eichler, Hill, Richards, Inc. v. Berner,
  472 U.S. 299 (1985).............................................................18

10
11

Berry v. Valence Technologies, Inc.,
  175 F.3d 699 (9th Cir. 1999) ................................................20

12
13

Binder v. Gillespie,
  184 F.3d 1059 (9th Cir. 1999), cert. denied, 528 U.S. 1154 (2000) ........5, 15, 37

14
15

Blackie v. Barrack,
  524 F.2d 891 (9th Cir. 1975) ...............................................15

16

Brody v. Transitional Hospitals Corp.,
  280 F.3d 997 (9th Cir. 2002) ...............................................15

17
18

Cammer v. Bloom,
  711 F.Supp. 1264 (D.N.J.1989).............................................38

19
20

Carpenter v. Edward & Warrn
  444 U.S. 868 (1979) ...........................................................18

21
22

Carpenter v. Harris, Upham & Co.,
  594 F.2d 388 (4th Cir.), cert. denied sub nom, Carpenter v. Edward &
  Warren, 444 U.S. 868 (1979) ...............................................18

23
24

Carter Wallace, Inc. v. Otte,
  474 F.2d 529 (2d Cir. 1972) ................................................31

25
26

Donohoe v. Consolidated Operating and Prod. Corp.,
  30 F.3d 907 (7th Cir. 1994) ................................................18

27
28

Dura Pharms., Inc. v. Broudo,
  544 U.S. 336 (2005)...........................................................4, 5, 17

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                    i

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Ernst & Ernst v. Hochfelder,
  425 U.S. 185 (1976)................................................................6

FMC Corp. v. Vendo Co.,
  196 F. Supp. 2d 1023 (E.D. Cal. 2002) ...............................32

General Signal Corp. v. MCI Telecommunications Corp.,
  66 F.3d 1500 (9th Cir. 1995) ...............................................2

Grossman v. Novell, Inc.,
  120 F.3d 1112 (10th Cir. 1997) ..........................................16

Harris v. Ivax,
  182 F.3d 799 (11th Cir. 1999) ............................................16

Hollinger v. Titan Capital Corp.,
  914 F.2d 1564 (9th Cir. 1990) ............................................18

Holmes v. Merck & Co., Inc.,
  2006 U.S. Dist. LEXIS 42370 (D. Nev. Jun. 22, 2006) .....31

Howard v. Hui,
  2001 U.S. Dist. Lexis 15443 (N.D. Cal. 2001) ....................6

Howard v Systems, Inc.,
  228 F.3d 1057 (9th Cir. 2000) .............................................5

In re 2TheMart.com, Inc. Sec. Litig.,
  114 F. Supp. 2d 955 (C.D. Cal. 2000)................................38

In re Homestore.com, Inc. Sec. Litig.,
  347 F. Supp. 2d 769 (C.D. Cal. 2004)..................................4

In re Homestore.com, Inc. Sec. Litig.,
  252 F. Supp. 2d 1018 (C.D. Cal. 2003)................................6

In re JDS Uniphase Corp. Sec. Litig.,
  Case No. CV 02-01486 CW (N.D. Cal.) .............................16

In re McKesson HBOC, Inc. Sec. Litig.,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000)................................6

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                    ii

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

In re Merrill Lynch Research Reports Securities Litigation,
  Master File No. 02 MDL 1484 (JFK) (S.D.N.Y.) ...............................................27

In re Splash Tech. Holdings, Inc. Sec. Litig.,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001)...........................................................16

In re Stac Electronics Sec. Litig.,
  89 F.3d 1399 (9th Cir. 1996) ........................................................................16

In re Syntex Corp. Sec. Litig.,
  95 F.3d 922 (9th Cir. 1996) ..........................................................................16

In re Worldcom, Inc. Sec. Litig.,
  2005 U.S. Dist. LEXIS 2603 (S.D.N.Y. 2005) ...................................................36

In re Worlds of Wonder Sec. Litig.,
  35 F.3d 1407 (9th Cir. 1994) ........................................................................16

Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,
  501 U.S. 350 (1991)...................................................................................20

Lehan v. Ambassador Programs, Inc.,
  190 F.R.D. 670 (E.D. Wash. 2000) ..................................................................32

McDermott v. Liberty Mar., Corp.,
  2010 U.S. Dist. LEXIS 96992 ........................................................................31

Morse v. McWhorter,
  Case No. 3:97-0370, 1998 U.S. Dist. Lexis 19053 (M.D. Tenn. July 1, 1998) . 17

Newton v. Uniwest Financial Corp.,
  802 F. Supp. 361 (D. Nev. 1990), aff'd, 967 F.2d 340 (9th Cir. 1992) .............17

Otsuka v. Polo Ralph Lauren Corp.,
  2010 U.S. Dist. LEXIS 25017 (N.D. Cal. Mar. 17, 2010) ...............................32

Paracor Finance Corp. v. Gen'l Electric Capital Corp.,
  96 F.3d 1151 (9th Cir. 1996) ..........................................................................6

Rochez Bros., Inc. v. Rhoades,
  527 F.2d 880 (3d Cir. 1975) ...........................................................................18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Schreiber v. Pennzoil Co.,
    419 A.2d 952 (Del. Ch. 1980) ...........................................................................17

SEC v. Steadman,
    967 F.2d 636 (D.C. Cir. 1992) ..........................................................................17

Stavroff v. Mayo
    129 F. 3d 1265 (6th Cir. 1997) ........................................................................17

United States v. Jones,
    231 F.3d 508 (9th Cir. 2000) ...........................................................................18


**STATUTES**

15 U.S.C. §§ 78j(b) and 78ff ...............................................................................7

15 U.S.C. § 78t(a) ..................................................................................1, 5, 18

15 U.S.C. §78u-4(b)(4) .................................................................................17, 38

15 U.S.C. § 78u-4(f)(2)(A) ..............................................................................6, 19

15 U.S.C. § 78u-4(f)(2)(B) ...................................................................................19

15 U.S.C. § 78u-4(f)(3)......................................................................................19

15 U.S.C. § 78u-4(f)(3)(C) ...................................................................................19

15 U.S.C. § 78u-4(f)(7)(B) ...................................................................................19

15 U.S.C. § 78u-5(c)(1)(A)(i) ................................................................................16

28 U.S.C. 1391(b) ...............................................................................................1

Del. Code Ann. 8 § 141(e) (2004) .........................................................................17

Securities Act of 1933 § 17(a) ...............................................................................7

Securities Exchange Act of 1934 § 10(b)..............................................................4, 5, 26

Securities Exchange Act of 1934 § 20(a) ..........................................................passim

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Securities Exchange Act of 1934 § 27 ..................................................................1

Securities Exchange Act of 1934 §§ 13(a) and 13(b)(2)(A) ...................................7

Securities Exchange Act of 1934 §§ 1331 and 1337 ..............................................1

Title 18, United States Code, § 371 .......................................................................7

## OTHER AUTHORITIES

17 C.F.R. §240.10b-5 .............................................................................1, 4, 7

17 C.F.R. §§ 240.10b-5 & 240.13b2-2 ...................................................................7

17 C.F.R. §§ 240.12b-20, 240.13a-13 & 240.13b2-1 .............................................7

A. Bromberg & L. Lowenfels, SECURITIES FRAUD AND COMMODITIES FRAUD,
    vol. 4, § 7:340 (West, June 2004) .....................................................................6

Black's Law Dictionary 779 (7th ed. 1999) ...........................................................18

Black's Law Dictionary 1159 (7th ed. 1999) ..........................................................20

Federal Rules of Civil Procedure, Rule 26(a)(3) ....................................................29

Federal Rules of Civil Procedure, Rule 42(b) ........................................................39

Federal Rules of Evidence 404(a) ...........................................................................33

Federal Rules of Evidence 404 (b) ..........................................................................32

Federal Rules of Evidence 408 ...............................................................................33

Federal Rules of Evidence 804(b)(1) .......................................................................33

L.R. 10 .....................................................................................................................31

L.R. 16 ......................................................................................................................1

L.R. 16-2.7 ...............................................................................................................29

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**

v

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

L.R. 16-5 ...........................................................................................29

L.R. 32-1, 51-5 ................................................................................31

L.R. 32-1: .........................................................................................31

Rest. (2d) Agency § 282 (1958) ..............................................18

Restatement (2d) of Torts § 451 (1963-64) ............................17

Securities and Exchange Commission Rule 10b-5...........................1, 4, 5

Following pretrial proceedings, pursuant to Rule 16, F.R.Civ.P. and L.R. 16, IT IS ORDERED:

## I.     THE PARTIES

The parties to this matter are Plaintiff California State Teachers' Retirement System ("Plaintiff" or "CalSTRS") and Defendant Stuart H. Wolff ("Defendant" or "Mr. Wolff").  Mr. Wolff has been served and has appeared.  All other parties named in the pleadings are now dismissed.  The pleadings which raise the issues are the Second Amended Consolidated Complaint and Mr. Wolff's Answer thereto.

On September 29, 2003, the Honorable Marsha J. Pechman certified a class defined as follows:

> All persons or entities (excluding defendants, any members of their immediate families, any person, firm, trust, corporation, present or former officer, director, or other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants, and any legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any excluded party), who purchased Homestore.com, Inc. Stock from January 1, 2000 through December 21, 2001.

On November 17, 2004, the Honorable Ronald S.W. Lew granted "Defendant PWC's motion for an order establishing a subclass of Dismissed Defendants."

## II.    FEDERAL JURISDICTION AND VENUE

Federal subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1337 and §27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the Securities and Exchange Commission ("SEC").

Venue is appropriate in the Central District of California pursuant to §27 of the Exchange Act and §28 U.S.C. 1391(b).  Defendant resides in this District and a substantial part of the events or omissions allegedly giving rise to the claims occurred in this District.

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                          1

## III.   TRIAL ESTIMATE

### A.   Plaintiff's Estimate

Plaintiff proposes a total of a **10 day trial limit** for evidence.  *General Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1508 (9th Cir. 1995) ("Generally, a district court may impose reasonable time limits on a trial.")  Plaintiff proposes that each side be given 5 days to present evidence.

### B.   Mr. Wolff's Estimate

Mr. Wolff estimates that the trial of this complex securities class action will take approximately 15-20 trial days in total.

Mr. Wolff objects to Plaintiff's proposal to place an unreasonable and artificial limit on the time for trial, particularly where this "proposal" represents a last-minute change from an earlier estimate of approximately 8 days for plaintiffs' case in chief. Plaintiffs' proposal is nothing more than an effort to curtail Mr. Wolff's defense and prevent a fair trial of this case on the merits.  This case covers a 2-year time frame and, according to plaintiffs, 121 corporate transactions, complex accounting issues and multiple public statements over that 2-year time frame.  The parties have identified a minimum of 20 witnesses, including several expert witnesses, and hundreds of potential exhibits.  A related criminal trial covering less than half the time period at issue here, and a more limited number of transactions and statements, required 40 trial days.  Plaintiffs have resisted all efforts at settlement of this case and have insisted on a trial; they must at least be required to make it a fair one.

## IV.   JURY TRIAL

The trial is to be a jury trial.

## V.   ADMITTED FACTS

The following facts are admitted and require no proof:

### A.   Facts Admitted By CalSTRS

1.    CalSTRS is the third largest public pension fund in the United States. CalSTRS administers retirement, disability and survivor benefits for California's

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                    2

public school educators in grades kindergarten through community college.  CalSTRS serves approximately 686,855 members and benefit recipients.  CalSTRS is administered by a 12-member Retirement Board and employs 540 employees.

2.      CalSTRS purchased 431,123 total shares of Homestore common stock from May 4, 2000 to December 21, 2001, and invested a total of $13,361,336.03. This stock was purchased through the NASDAQ.

**B.      Facts Admitted By Mr. Wolff**

1.      Stuart H. Wolff was a founder of Homestore and served as Homestore's CEO and Chairman of its Board of Directors from approximately November 1996 to January 2002.

Note that Mr. Wolff does not agree to the above statement of CalSTRS' "admitted facts," at least part of which will be the subject of a pre-trial motion.

## VI.   STIPULATED FACTS

The following facts, though stipulated, shall be without prejudice to any evidentiary objection:

1.      Homestore is the largest Internet-based provider of residential real estate listings and related content in the world.  During the years 2000-2001, Homestore maintained its principal place of business in Westlake Village, California.

2.      During the years 2000-2001, Homestore stock traded on the NASDAQ under the symbol "HOMS," and now trades on the NASDAQ under the symbol "MOVE."

3.      During the years 2000-2001, Homestore filed Form 10-Ks, Form 10-Qs, and other documents with the Securities & Exchange Commission.

/ / /

/ / /

/ / /

/ / /

/ / /

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                              3

## VII.   CLAIMS AND DEFENSES OF THE PARTIES

### A.   Plaintiff's Claims

(a)   Plaintiff, on behalf of the certified Class, plans to pursue the following claims against Wolff:

Claim 1:   Wolff violated Section 10(b) of the Securities Exchange Act (15 U.S.C. §78j(b)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5);

Claim 2:   Wolff violated Section 20(a) of the Securities Exchange Act (15 U.S.C. §78j(b)).

(b)   Elements Required To Establish Plaintiff's Claims

**Plaintiff's Statement of The Elements**

#### 1.   Section 10(b) of the Securities Exchange Act

To prove a primary violation under Section 10(b), plaintiff must establish, by a preponderance of the evidence, the following six elements:

1.   A material misrepresentation (or omission);

2.   Scienter, *i.e.*, a wrongful state of mind;

3.   A connection with the purchase or sale of a security;

4.   Reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;"

5.   Economic loss; and

6.   Loss causation, i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005); *see also In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 783-788 (C.D. Cal. 2004) (discussing elements and application).

/ / /

/ / /

/ / /

///

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                    4

### 2. Section 20(a) of the Securities Exchange Act

Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §78t(a), §20(a), provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title, or of any rule or regulation thereunder, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

A violation of Section 20(a) is established where there is: (1) a primary violation of federal securities laws; and (2) the Defendant exercised actual power or control over the primary violator. *Howard v Systems, Inc.,* 228 F.3d 1057 (9th Cir. 2000) (citation omitted).

### Defendant Wolff's Statement of the Elements

Mr. Wolff asserts that the elements of the plaintiffs' claims are:

### 1. Section 10(b) of the Securities Exchange Act

In cases involving publicly traded securities and purchases or sales in public securities markets, the basic elements of a private claim for damages under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 include:

1. A misstatement of material fact made by the defendant*;*

2. With scienter, *i.e.*, a wrongful state of mind;

3. In connection with the purchase or sale of a security;

4. Justifiable and reasonable reliance by the plaintiff on the alleged misstatement, also referred to as "transaction causation";

5. Economic loss; and,

6. Loss causation, *i.e.*, a proximate causal connection between the material misrepresentation and the alleged loss.

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (citations omitted); Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999), cert. denied, 528 U.S. 1154 (2000);

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                     5

see also In re Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d 1018, 1041 (C.D. Cal. 2003) (holding that plaintiffs' claims in this case are based upon alleged false statements).

The nature and parameters of each of these basic elements, in turn, require the plaintiff to establish certain subsidiary matters and also limit the nature of proof which satisfies these elements, which Mr. Wolff will address when proposing jury instructions.

**2.    Section 20(a) of the Securities Exchange Act.**

To establish a violation of Section 20(a) of the Securities Exchange Act of 1934, a plaintiff must prove, at least:

1.    The "controlled" person is primarily liable for a violation of Section 10(b), meaning that the plaintiff must prove each of the elements of a Section 10(b) violation by the "controlled" person;

2.    The defendant exercised actual power or control over the underlying primary violation, which means that the defendant exercised a significant degree of day-to-day operational control over the conduct constituting the violations, amounting to the power to dictate another person's conduct – general control over a company is not enough; in an accounting case, this means that the defendant exercised specific control over the preparation and release of the financial statements; and,

3.    The defendant acted with the requisite culpable state of mind.

Paracor Finance Corp. v. Gen'l Electric Capital Corp., 96 F.3d 1151 (9th Cir. 1996); In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000); Howard v. Hui, 2001 U.S. Dist. Lexis 15443 (N.D. Cal. 2001); A. Bromberg & L. Lowenfels, SECURITIES FRAUD AND COMMODITIES FRAUD, Vol. 4, § 7:340 (West, June 2004); Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976); 15 U.S.C. § 78u-4(f)(2)(A).

/ / /

/ / /

/ / /

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                      6

(c)     Evidence Relied Upon By Plaintiff To Prove Its Claims Against Wolff

Plaintiff asserts that it can establish violations of Section 10(b) and 20(a) through evidence of some or all of the following:

- On January 1, 2010, Wolff entered into a **Binding Plea Agreement** with the United States Attorney's Office for the Central District of California. According to the document, he plead guilty to criminal conspiracy in violation of Title 18, United States Code, Section 371, which consists of (1) an "agreement between two or more people to commit the crime of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5;" (2) entered into by Stuart Wolff with the knowledge of "its object and intending to help accomplish it;" and that "[o]ne of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy."

- On December 2, 2010, Wolff entered into **an agreement with the Securities and Exchange Commission consenting to Final Judgment of Permanent Injunction and Other Relief**.  By the terms of the Final Judgment, Wolff agreed to be found "liable for disgorgement of profits gained as a result of the conduct alleged in the Complaint."  In addition, Wolff was restrained and enjoined from any further violations Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78,(b)(5), and Rules 10b-5 and 13b2-2, thereunder, 17 C.F.R. §§ 240.10b-5 & 240.13b2-2, and from aiding and abetting violations of Section 13(a) and 13(b)(2)(A) of the Exchange Act, 15 U.S.C. §§ 78m(a) & 78m(b)(2)(A), and Rules 12b-20, 13a-13 and 13b2-1, thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-13 & 240.13b2-1.

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                      7

- Stuart Wolff was a founder of Homestore and served as Homestore's CEO and Chairman of its Board of Directors from November 1996 to January 2002.

- During the Class Period, Wolff sold hundreds of thousands of shares of Homestore stock for a substantial profit while in possession of adverse, material, non-public information regarding the true financial condition of Homestore.

- During the Class Period, Wolff made numerous public statements about Homestore's financial condition, including in Press Releases, speeches, communications with analysts and filings with the Securities & Exchange Commission.

- During the Class period, all senior management and department heads, including Giesecke, Shew and Tafeen, reported directly to Wolff.

- Wolff enjoyed a very close relationship, and worked directly with Tafeen, on a day-to-day basis.  Tafeen was one of Wolff's first and most important hires as he was forming Homestore.  Wolff spoke to Tafeen "about 20 times per day." Wolff also placed extreme pressure on Tafeen to obtain revenues at any cost.

- Wolff was a "very, very hands-on manager" who established a "tone at the top" style of leadership and played a dominant role at Homestore.

- Wolff himself was an aggressive deal-maker who displayed knowledge of how deals worked.  For example, at Homestore board meetings, Wolff presented management's position regarding various transactions and acquisitions, often providing detailed explanations of the transactions.

- Wolff also set the financial goals for Homestore. Wolff had detailed knowledge about Homestore's finances and was "intimately involved in the finance process."  Wolff was "very involved in . . . helping to set goals in terms of where revenue should be, where earnings per share should be

as well as getting into detailed discussions with individual managers and their departments" in order to make sure that the financial goals were met. Likewise, although Wolff may not have been involved in the actual physical preparation of the financial statements, he was directly involved in the financial process to make sure that Homestore met his revenue targets.

- Wolff set Homestore's financial goals against what was deemed to be "Tier 1" companies, which included Yahoo!, eBay and Amazon. These companies were determined to be "Category Killers," i.e., they led their category in their industry. As decided by Wolff, Homestore was going to beat revenue expectations by a certain amount and a certain percentage. The goals set by Homestore were unrealistic and arbitrary.

- Wolff made it clear that those under him were to use any means necessary to achieve those financial goals in order to fuel Homestore's stock price. Wolff understood that if Homestore missed its numbers, the stock would get crushed by Wall Street. Wolff was also very cognizant of the market's reaction to Homestore's business deals.

- Wolff was not only involved in setting the financial goals for Homestore but where the revenue sources were coming from. Although Wolff was not personally involved in executing the transactions and was knowledgeable about the transactions through his contact with Tafeen and his review of R&O schedules. The R&O schedules identified the "plugs" or revenues needed to meet Homestore's quarterly numbers and were the basis for meetings attended by Wolff, Tafeen, Giesecke and Shew, wherein the group discussed among other matters, individual deal terms and how much revenue would be recognized from a particular transaction.

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                    9

- Wolff was also directly and substantially involved in the fraudulent transactions with many companies including AOL, Translations, and Cendant.

- During the Class period, Wolff knowingly had and/or approved Homestore's entry of fraudulent transactions with AOL, Cendant, L90, Budget, Translations, Dell Corporation, Bank of America, RealNet, GMAC, Promisemark, Classmates, Hometest, Dorado, and iPlace. All of these deals were restated as revenue recognition for these deals were not allowed under accounting standards.

- Wolff held a two-thirds interest in an investment partnership entitled SPD, LLC ("SPD"). SPD stood for Stuart Wolff, Peter Tafeen and David Rosenblatt, Homestore's General Counsel. In March 2000, SPD invested in a company entitled Translations.com. On June 6, 2000, Translations purchased $500,000 in advertising from Homestore. On June 29, 2000, Homestore wired $500,000 to Translations. Homestore was forced to restate $500,000 in revenues from transactions related to Translations because it was unclear why Homestore wired $500,000 to Translations. The investigative team believed that the payment may have been for equity interest in Translations, which was diverted to SPD - Wolff's personal investment vehicle.

- In March of 2001, Homestore entered into acquisition discussions with AOL, nicknamed the "Final Four," i.e., the NCAA basketball finals. Homestore's management, including Wolff, sought this merger with the understanding that merger would hide Homestore's fraudulent transactions with AOL. AOL decided against the acquisition sometime in the second quarter of 2001. It was in this context that Wolff wrote to AOL requesting that "[AOL] send me back or destroy all confidential material related to

our recent acquisition discussions." Wolff also stood to personally make over $100 million if the acquisition was completed.

- On May 7, 2001, Wolff attended a meeting with Tafeen, Giesecke and Shew at the Cal Amigos ranch. Entering into the meeting, the group, including Wolff understood that Homestore was $40 million short of its projected revenues for the quarter. During the meeting, Tafeen stated that: "Alls (sic) we have is AOL, Cendant, and barter" to make up for the shortfall. Shew then explained to the group that Homestore had "to be careful with these transactions because we have to document them in a certain way in order to get revenue." Shew then reiterated that there could be nothing for PricewaterhouseCoopers, its auditors, to see on the documentation for the AOL deal.

- Wolff approved any check in an amount above $50,000 and any wire transfer in excess of $250,000. In early June 2001, Wolff, authorized payment to AOL for a transaction whereby Homestore would receive $31.5 million in gross revenue and during the three-week period from June to July of 2001. As part of this transaction, Wolff authorized $40-45 million in wire transfers to other entities. Although the wire transfer forms authorized payment to a third party vendor, Shew affirmatively told Wolff that they related to the AOL transactions. Shew would: "always tell [Wolff] what [the wire transfer authorization forms] related to. The fact that they related to third-party vendor transactions was inconsequential to what the wire was being prepared for. The wire was being prepared for a circular flow."

- At the end of June 2001, a dispute between AOL and Homestore arose regarding the credit risk AOL was assuming in completing the fraudulent triangular deals. During this period, Wolff also directly received and sent numerous emails to AOL requesting payment from AOL as part of the

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                    11

triangular deals.  Wolff also participated in a conference call with AOL wherein the triangular structure was discussed in detail and Wolff was provided a schedule depicting the circular flow of money.

- More than half way through the third quarter, Wolff knew that Homestore was millions of dollars short of its projected revenues.  He was urged to reset the guidance for the quarter but decided against it.  In a "last-ditch" effort, when "[t]he house of cards is coming tumbling down," Wolff sat in the back of a town car with Shew and Giesecke conspiring about how they could "get enough revenue for Q3" so that their numbers would at least be "respectable" and their stock would only "get just a little hammered by Wall Street."  On September 6, 2001, rather than lower expectations, Wolff authorized Homestore to issue a press release reaffirming their third quarter guidance. On October 3, 2001, just 27 days later, Homestore announced that it would miss its numbers which Wolff blamed on "9/11."  On November 1, 2001, Wolff again knowingly misled investors in a conference call when asked about the drastic drop in advertising revenue.

- On November 14, 2001 Wolff signed Homestore's Form 10-Q for the third quarter of 2001, which incorporated revenues from the Cendant/RETT deals even though he knew of the existence of four unauthorized Preferred Alliance Agreements executed by Tafeen with Cendant and an attempt made by third party L90 to extort money for confirming a transaction.  CFO Joseph Shew refused to sign the same 10-Q.

- During the Class period, Wolff signed every major SEC filing, including the fraudulent 10-Ks and 10Qs, which were ultimately restated in 2002.  The financial statements of Homestore were materially misstated, including the filings with the Securities and Exchange Commission and

other public announcements.  According to expert testimony, these misstatements can be attributed to Wolff.

- Wolff knowingly and/or with a reckless disregard for whether it was true or not, made a material misrepresentation and/or failed to disclose a material fact that was necessary to prevent the statements that were being made from being misleading under the circumstances.  Expert testimony supports the same.

- Expert testimony will show that Wolff's acts and/or omissions played a substantial part in bringing about or actually causing damage to CalSTRS and the Class, including the decrease in value of their Homestore stock.

- CalSTRS and the Class overpaid for their Homestore stock due to an inflated market price of the stock and Wolff's material misrepresentations and/or omissions were a substantial contributing factor to that price inflation, as established by expert testimony.

- While in possession of knowledge, unknown to the public and investors, regarding Homestore's false financial statements and improper accounting, Wolff engaged in insider trading transactions.

- Wolff had the ability to exercise actual power and/or control over Homestore.

- Testimony from witnesses including, but not limited to, Pater Tafeen, John Giesecke, and Joseph Shew will establish Wolff's knowledge of the conspiracy.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                    13

### B.   Defendant Wolff's Affirmative Defenses

(a)  In addition to contesting each of the elements of plaintiffs' claims (and Mr. Wolff disputes that plaintiffs can legally or factually establish violations of Section 10(b) and 20(a) through evidence of the matters set forth above), defendant Wolff plans to pursue the following defenses:

First Defense:  Lack of Standing to Sue.

Second Defense:  Lack Of Reliance By Plaintiffs.

Third Defense:  Statutory Safe Harbor for Forward-Looking Statements.

Fourth Defense:  Statements Bespeak Caution.

Fifth Defense:  Reliance on Accounting and Legal Experts.

Sixth Defense:  Intervening Causation.

Seventh Affirmative Defense:  In Pari Delicto and Unclean Hands

Eighth Affirmative Defense (20(a) Claim):  Adverse Interest Doctrine.

Ninth Affirmative Defense (20(a) Claim):  Good Faith.

Tenth Affirmative Defense:  Apportionment of Fault.

Eleventh Affirmative Defense:  Satisfaction of Claim/Reduction Based on Prior Settlements.

Twelfth Affirmative Defense:  Waiver and Release.

Thirteenth Affirmative Defense:  Statute of Limitations.

(b)  The elements required to establish Defendant Wolff's affirmative defenses are:

### First Defense:  Lack of Standing to Sue.

It is plaintiffs' burden to demonstrate their standing to sue; therefore, lack of standing is not an *affirmative* defense and Mr. Wolff does not accept the burden of proof on this issue.  However, by motion prior to the trial and/or at an appropriate time following the failure of plaintiffs' proof, Mr. Wolff expects to address at least the following matters:

1.    Each individual plaintiff bears the burden to establish a purchase of Homestore stock after the dissemination of a particular alleged misrepresentation, or the plaintiff will not have standing to bring a claim based on that alleged misrepresentation.  See Binder, 184 F.3d at 1069.

2.    In order to assert an insider trading claim, a plaintiff must have bought or sold stock contemporaneously with the defendant's sales or purchases of the stock. Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1002 (9th Cir. 2002).  Mr. Wolff will request that, if such a claim survives pre-trial motions, that the jury instructions properly reflect plaintiffs' burden to establish this element.

**Second Defense:  Lack Of Reliance By Plaintiffs.**

Reasonable and justifiable reliance is an element of plaintiffs' claims against defendant Wolff; therefore, lack of reliance by plaintiffs is not an affirmative defense and Mr. Wolff does not accept the initial burden of proof on this issue.  However, to the extent that plaintiffs can establish an entitlement to a presumption of reliance (and Mr. Wolff contends that they cannot in this case), then Mr. Wolff would have the right to rebut that presumption.  Thus, for example, if plaintiffs establish the prerequisites for the so-called "fraud on the market" presumption of reliance (which Mr. Wolff contends they cannot), Mr. Wolff may make "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff" and such a showing "will be sufficient to rebut the presumption of reliance." Basic, Inc. v. Levinson, 485 U.S. 224, 248 (1988).  This showing may be made on an individual plaintiff-by-plaintiff basis.  Id.; see also Blackie v. Barrack, 524 F.2d 891, 906 n.22 (9th Cir. 1975).

**Third Defense:  Statutory Safe Harbor for Forward-Looking Statements.**

The controlling statute provides that an issuer of securities or a person acting on behalf of such issuer shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is accompanied by meaningful cautionary statements identifying important factors that

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                     15

could cause actual results to differ materially from those in the forward-looking statement.  If the forward-looking statement is oral, such as during a conference call, the identification of these factors may be made by reference to readily available documents that contain them.  15 U.S.C. § 78u-5(c)(1)(A)(i); In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1068-69 (N.D. Cal. 2001); Harris v. Ivax, 182 F.3d 799, 807 (11th Cir. 1999).

Mr. Wolff contends that, as reflected in the legislative history of the controlling statute and as found by the court at the trial of the case in In re JDS Uniphase Corp. Sec. Litig., Case No. CV 02-01486 CW (N.D. Cal.), it is plaintiffs' burden to prove in the first instance that such cautionary statements were not made.  Mr. Wolff will request that the jury instructions in this case properly reflect plaintiffs' burden on this issue.

### Fourth Defense:  Statements Bespeak Caution.

As with the statutory safe harbor, under the "bespeaks caution" doctrine, forward-looking statements and projections are immune from liability when accompanied in the market by cautionary language, which affects the reasonableness of a plaintiff's reliance on and the materiality of the forward-looking statements and projections.  In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1406 (9th Cir. 1996); In re Syntex Corp. Sec. Litig., 95 F.3d 922, 929 (9th Cir. 1996); In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1414 (9th Cir. 1994).

Under the "bespeaks caution" doctrine, the cautionary language need not be in the same document as the challenged forward-looking statement.  See Grossman v. Novell, Inc., 120 F.3d 1112, 1122 (10th Cir. 1997).

As with the statutory safe harbor, Mr. Wolff contends that it is plaintiffs' burden to prove in the first instance that such cautionary statements were not made.  Mr. Wolff will request that the jury instructions in this case properly reflect plaintiffs' burden on this issue.

/ / /

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**

16

**Fifth Defense:  Reliance on Accounting and Legal Experts.**

It is plaintiffs' burden to prove the element of scienter in this case, and Mr. Wolff does have the burden of proof with respect to this element.  However, Mr. Wolff is entitled to show and will request a jury instruction in accordance with the law which establishes that reliance on accounting experts to prepare financial statements in conformity with GAAP is inconsistent with intent to defraud.  <u>Newton v. Uniwest Financial Corp.</u>, 802 F. Supp. 361, 367-68 (D. Nev. 1990), <u>aff'd</u>, 967 F.2d 340 (9th Cir. 1992); <u>accord</u> <u>Morse v. McWhorter</u>, Case No. 3:97-0370, 1998 U.S. Dist. Lexis 19053 at 98 (M.D. Tenn. July 1, 1998) (citing <u>Stavroff v. Mayo</u>, 129 F.3d 1265 (6th Cir. 1997)).

Similarly, reliance on attorneys with respect to legal duties is inconsistent with intent to defraud.  <u>SEC v. Steadman</u>, 967 F.2d 636, 642-43 (D.C. Cir. 1992); <u>see also</u> <u>Schreiber v. Pennzoil Co.</u>, 419 A.2d 952, 956 (Del. Ch. 1980) (officers and directors of Delaware corporations are protected by business judgment rule, which allows for good faith reliance on accountants and other experts); Del. Code Ann. 8 § 141(e) (2004).

**Sixth Defense:  Intervening Causation.**

It is plaintiffs' burden to prove the element of causation in this case (<u>see</u>, <u>e.g.</u>, 15 U.S.C. §78u-4(b)(4)), and Mr. Wolff does have the burden of proof with respect to this element.  However, Mr. Wolff is entitled to show that no alleged act or omission attributable to Mr. Wolff was a proximate cause of any injury or loss suffered by any plaintiff and that, to the extent that a plaintiff did suffer any alleged injury or loss, such injury or loss was proximately caused by other persons or events.  Restatement (2d) of Torts § 451 (1963-64); <u>Dura</u>, 544 U.S. at 342-43.

**Seventh Affirmative Defense:  In Pari Delicto and Unclean Hands.**

A plaintiff's action may be barred where the plaintiff, through his actions, bears at least substantially equal responsibility for the alleged violations, and preclusion of the suit will not significantly interfere with effective enforcement of the securities laws

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                              17

and protection of the public.  Bateman, Eichler, Hill, Richards, Inc. v. Berner, 472 U.S. 299, 310-11 (1985).

### Eighth Affirmative Defense (Section 20(a) Claim):  Adverse Interest Doctrine.

The adverse interest doctrine bars a claim against a corporate entity for the acts or omissions of its officers and employees who acted in furtherance of their own interests at the expense of the company.  Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 884 (3d Cir. 1975); Rest. (2d) Agency § 282 (1958).

### Ninth Affirmative Defense (Section 20(a) Claim):  Good Faith.

Under Section 20(a), a controlling person may not be held liable for the controlled person's securities violations where "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

Good faith in the context of a Section 20(a) may be established by showing that the defendant "maintained and enforced a reasonable and proper system of supervision and internal control."  Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1576 (9th Cir. 1990); Donohoe v. Consolidated Operating and Prod. Corp., 30 F.3d 907, 912 (7th Cir. 1994); Carpenter v. Harris, Upham & Co., 594 F.2d 388, 394 (4th Cir.), cert. denied sub nom, Carpenter v. Edward & Warren, 444 U.S. 868 (1979).

"Inducement" is "[t]he act or process of enticing or persuading another person to take a certain course of action."  Black's Law Dictionary 779 (7th ed. 1999).  "Mere suggestion or the offering of an opportunity to commit a crime is not conduct amounting to inducement"; what is required is "repeated and persistent solicitation or persuasion which overcomes the [perpetrator's] reluctance."  United States v. Jones, 231 F.3d 508, 517 (9th Cir. 2000).

/ / /

/ / /

/ / /

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                      18

**Tenth Affirmative Defense:  Apportionment of Fault.**

Under the controlling statute, only a defendant who is specifically found by the trier of fact to have committed a knowing violation of the securities laws may be subject to joint and several liability for that violation.  15 U.S.C. § 78u-4(f)(2)(A). Unless a knowing violation is found, a defendant may be "liable solely for that portion of the judgment that corresponds to the percentage of responsibility of that [defendant]."  15 U.S.C. § 78u-4(f)(2)(B).

These issues must be the subject of special interrogatories with respect to each alleged misstatement and each person claimed by any party (including Mr. Wolff) to have caused or contributed to the loss allegedly incurred by the plaintiff with respect to that misstatement, including persons who have entered into settlements.  For each such person the trier of fact must determine whether the person violated the securities laws, whether the person did so knowingly, and the percentage of responsibility of such person, measured as a percentage of the total fault of all persons who caused or contributed to the alleged loss.  15 U.S.C. § 78u-4(f)(3).  In determining the percentage of responsibility, the trier of fact shall consider the nature of the conduct of each person and the nature and extent of the causal relationship between the conduct of each such person and the alleged damages.  15 U.S.C. § 78u-4(f)(3)(C).

**Eleventh Affirmative Defense:  Satisfaction of Claim/Reduction of Liability Based on Prior Settlements.**

According to the controlling statute, where a person has settled claims by a plaintiff relating to an alleged loss, any verdict or judgment against a non-settling party (in this case, Mr. Wolff) with respect to that alleged loss must be reduced by the greater of "(i) an amount that corresponds to the percentage of responsibility of that [settled] person; or (ii) the amount paid to the plaintiff by that [settled] person."  15 U.S.C. § 78u-4(f)(7)(B).  In addition, each individual plaintiff is limited by law to recovery of actual damages; therefore, each plaintiff could only recover from Mr.

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                              19

Wolff to the extent that the plaintiff has not already been compensated for such damages from other sources.

### Twelfth Affirmative Defense:  Waiver and Release.

Waiver is the intentional or voluntary relinquishment of a known right.  Waiver results from the unilateral act or conduct of the party against whom is it asserted, and no act of the party in whose favor it is made is necessary to complete it.  See Black's Law Dictionary 1159 (7th ed. 1999).

### Thirteenth Affirmative Defense:  Statute of Limitations.

To the extent that any plaintiff failed to commence an action within one year after notice of matters about which they now complain, such plaintiff's claims are barred by the applicable statute of limitations.  Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991); Berry v. Valence Technologies, Inc., 175 F.3d 699, 703 (9th Cir. 1999).

(c)  In brief, the key evidence Defendant Wolff relies on for each affirmative defense will be the deposition and trial testimony of the witnesses identified on his witness list, the pleadings and papers on file in this action, and the documents identified on the parties' joint exhibit list.  Mr. Wolff expects that this evidence, and/or plaintiffs' failure of proof, will demonstrate at least the following:

### First Defense:  Lack of Standing to Sue.

1.      To the extent that plaintiffs fail to meet their burden of proof on each of the elements of their claims with respect to particular alleged false statements or omissions, and any other part of the case nevertheless survives, Mr. Wolff expects to seek corresponding limits on the temporal scope of the class and/or to challenge claims for recovery made by individual shareholders following any judgment.

2.      Based on CalSTRS' stock records, Mr. Wolff contends that CalSTRS cannot establish that it traded Homestore stock contemporaneously with Mr. Wolff, and observes that no class or subclass of alleged contemporaneous traders has ever

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                            20

been certified in this case.  It is Mr. Wolff's position, therefore, that such a claim cannot properly be pursued against Mr. Wolff at the trial in this case.

**Second Defense:  Lack Of Reliance By Plaintiffs.**

In addition to reliance, plaintiffs bear the burden of proving the materiality of the alleged misstatements and omissions for which they seek to impose liability on Mr. Wolff.  Mr. Wolff expects that the evidence (including testimony by his expert witness, Professor Meir Statman) will show that, even if plaintiffs could carry their burden to establish that Homestore's stock traded in an efficient market (which Mr. Wolff contends they cannot), plaintiffs cannot also show that any alleged misstatements were material to the market.  By failing to carry their burden on materiality with respect to a given statement, plaintiffs also sever any "fraud on the market" linkage between the statement and Homestore's stock price.

In addition, as reflected, for example, in the agreements by which they obtained their stock and in Homestore's SEC filings, certain entities that acquired Homestore stock during the time frame in question obtained the stock in negotiated, non-market transactions that were not dependent upon whether and how the then-existing market price for the stock incorporated the information that plaintiffs contend was misstated to the market in general.  Indeed, certain such entities (such as AOL and Cendant Corporation) were also participants in the transactions at issue in this case and were defendants that settled with plaintiffs in this lawsuit; those entities cannot now also be plaintiffs in this case.  To the extent that an entity obtained stock in a non-market transaction, and/or participated in the transactions that are at issue in the case, Mr. Wolff contends that they could not be found to have reasonably and justifiably relied on the stock market's pricing of Homestore stock in accordance with the "fraud on the market" doctrine.

Furthermore, Mr. Wolff would be entitled to contest each individual class member's alleged reliance on the integrity of the stock price in order to rebut the presumption of the so-called "fraud on the market" doctrine.  If necessary, this would

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                    21

1    most properly be contested in a post-trial claims process, when each individual
2    plaintiff's claim could be evaluated and challenged.

3              **Third Defense:  Statutory Safe Harbor for Forward-Looking Statements.**

4              Mr. Wolff contends that, to the extent that plaintiffs assert that Mr. Wolff should
5    be liable for any forward-looking statements made by him or otherwise in any of
6    Homestore's public statements (including, but not limited to, statements about various
7    business transactions and/or financial projections), Mr. Wolff cannot be liable by
8    virtue of the meaningful cautionary statements and "risk factors" that accompanied the
9    forward-looking statements in the marketplace.  Mr. Wolff expects that the evidence
10   will show that such meaningful cautionary statements and "risk factors" that warned
11   that future results might differ from the substance of the Company's forward-looking
12   statements and projections were included, for example, in each of Homestore's public
13   statements, including SEC filings, press releases, and conference calls, during the time
14   period in question.

15             **Fourth Defense:  Statements Bespeak Caution.**

16             Mr. Wolff contends that, to the extent that plaintiffs assert that Mr. Wolff should
17   be liable for any forward-looking statements made by him or otherwise in any of
18   Homestore's public statements (including, but not limited to, statements about various
19   business transactions and/or financial projections), Mr. Wolff cannot be liable by
20   virtue of the meaningful cautionary statements and "risk factors" that accompanied the
21   forward-looking statements in the marketplace.  Mr. Wolff expects that the evidence
22   will show that such meaningful cautionary statements and "risk factors" that warned
23   that future results might differ from the substance of the Company's forward-looking
24   statements and projections were included, for example, in each of Homestore's public
25   statements, including SEC filings, press releases, and conference calls, during the time
26   period in question.

27        / / /
28        / / /

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                          22

**Fifth Defense:  Reliance on Accounting and Legal Experts.**

Mr. Wolff expects that the testimony of the witnesses designated on both parties' witness lists and the exhibits, including emails and other documents produced by Homestore and PricewaterhouseCoopers LLP ("PwC"), will establish the following:

This case is about accounting.  There is nothing facially or inherently improper or illegal about any of the transactions at issue in this case.  The basic subject matter of the case concerns whether and by how much Homestore reported overstated revenues derived from these fourteen transactions for the periods in question.

The question of whether Homestore properly accounted for its revenues cannot be answered without an educated comprehension both of the relevant accounting principles and the relevant facts unique to each transaction.

Stuart Wolff had no knowledge, training or experience with respect to any relevant accounting principles.  Mr. Wolff had no training or experience generally in the management or operation of a business.  Mr. Wolff's education and training is in the sciences; he holds a PhD in Engineering, and his pre-Homestore work experience was almost entirely science- or technology-related.

It was understood by Homestore's board of directors and by Mr. Wolff that Homestore would develop a strong management team to make up for Mr. Wolff's lack of operational business experience.  This would (and did) include, for example, a strong Chief Operating Officer ("COO") who would have oversight with respect to the Company's day-to-day operations, including accounting and finance.  Throughout Mr. Wolff's tenure as Homestore's CEO, the Company had a COO with operational business experience, including at least two who were CPAs (including, during 2001, former CFO John Giesecke).

Mr. Wolff was advised by his mentor on Homestore's board of directors to build a management team he could trust and rely on and adapt his own role as CEO according to his own personal strengths and weaknesses.  Mr. Wolff did just that.  He

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                               23

focused on corporate strategy, competition issues, and new products, while leaving to others the day-to-day operational details of the Company, particularly with respect to accounting and finance.

Homestore built and maintained an adequate internal control structure, as attested contemporaneously by the Company's outside auditors and the Board of Directors' Audit Committee (on which Mr. Wolff did not serve). For example, as Homestore grew, Mr. Wolff approved the growth of the Company's Finance Department to include a large team of experienced accounting professionals, including several CPAs with experience at the big-four accounting firm PricewaterhouseCoopers LLP ("PwC") and/or respected companies like The Walt Disney Company.

Stuart Wolff concurred in the hiring of PwC as Homestore's outside audit firm, based at least in part upon presentations made by PwC that touted PwC's expertise and experience with respect to the accounting issues most germane to high-technology companies like Homestore, as well as the recommendation of the Company's then-Chief Financial Officer ("CFO"), John Giesecke. Ultimately, the Audit Committee approved Homestore's retention of PwC as the Company's outside audit firm.

Stuart Wolff understood and expected that the Finance Department communicated regularly and often with PwC concerning the appropriate structure and accounting for Homestore's business transactions. Mr. Wolff was also aware that each quarter PwC and the Finance Department discussed Homestore's financial reporting in depth with the Company's Audit Committee.

Stuart Wolff did not communicate regularly or directly with PwC. Communication with PwC was the province and responsibility of the Finance Department and the Audit Committee.

The accounting principles relevant to Homestore's transactions during the class period were complicated, changing, and not easy to understand.

Homestore's Finance Department, and particularly Joe Shew and John Giesecke, were vested with the authority and control within the Homestore organization to

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                    24

structure the Company's financial transactions to abide by Generally Accepted Accounting Principles ("GAAP"), and to make decisions regarding recognition of revenue in order to abide by GAAP.

Stuart Wolff did not participate in the day-to-day function of the Finance Department or participate in making accounting decisions and preparing financial statements. Mr. Wolff reasonably relied upon his COO, CFO, the Finance Department, PwC, and the Company's Audit Committee to ensure that Homestore's revenues were reported in accordance with GAAP and Homestore's financial statements were prepared in accordance with GAAP.

Stuart Wolff did not negotiate or structure any of the transactions at issue in this case. As a general matter, Mr. Wolff did not participate in the negotiation or approval of all transactions generated through Homestore's Business Development Department or Strategic Alliances Group. He was not aware of all relevant facts pertaining to the transactions at issue in this case.

Stuart Wolff did not participate in the preparation or review of Homestore's financial statements, and he did not participate in the preparation or review of the Company's SEC filings. The investor relations and SEC reporting functions within the Finance Department, along with the Legal Department, PwC, and outside counsel, were responsible for the preparation of Homestore's SEC filings and press releases. Mr. Wolff reasonably relied upon them to ensure the accuracy and completeness of these documents. Specifically, Mr. Wolff relied upon PwC, outside counsel, the Finance and Legal Departments, and the Audit Committee, when Homestore released its financial results including, but not limited to, the results for each quarter of 2000 and for the first three quarters of 2001. Furthermore, statements in Homestore's public communications that were allegedly attributed to Mr. Wolff were prepared and vetted by others, including the Finance/IR group, PwC, the Legal Department, and outside counsel.

**Sixth Defense:  Intervening Causation.**

To the extent that a plaintiff did suffer any alleged loss in this case, Mr. Wolff expects that the evidence will show that such injury or loss was proximately caused by other persons or events, including but not limited to the acts of former defendants in this case and/or changes in Homestore's stock price unrelated to any alleged misrepresentations or omissions alleged in this case.

**Seventh Affirmative Defense:  In Pari Delicto and Unclean Hands.**

Plaintiffs' own allegations in this case, as reflected in their complaints and in oppositions to motions to dismiss and motions for summary judgment (and the Court's rulings on such motions) identify the members of the so-called "Dismissed Defendants" subclass as either alleged violators of the securities laws or, at a minimum, essential willing participants in the alleged wrongdoing.  To the extent that these parties remain in the case (and Mr. Wolff contends that they should not), then if plaintiffs were to establish the elements of their claims in this case, they will have established them at least equally as to those parties.

**Eighth Affirmative Defense (20(a) Claim):  Adverse Interest Doctrine.**

Mr. Wolff contends that, to the extent that plaintiffs were able to establish the elements of a Section 10(b) claim against another Homestore officer, such as one of the other officers originally named as a defendant in this case, the evidence will show that such officer was acting in furtherance of his own interests against that of the Company's.

**Ninth Affirmative Defense (20(a) Claim):  Good Faith.**

Mr. Wolff contends that plaintiffs will not be able to establish the prima facie elements of a Section 20(a) claim.  Moreover, Mr. Wolff expects that the testimony of the witnesses designated on the parties' witness lists, and exhibits including emails and other documents produced by Homestore and PwC will demonstrate that, with Mr. Wolff's approval and support, Homestore developed a reasonable and proper system of supervision and internal control with respect to its financial reporting, public

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**

1  communications, and SEC filings.  Mr. Wolff also expects that this evidence will also

2  show that he did not induce any other person's alleged violation of the securities laws

3  (e.g., through repeated and persistent solicitation or persuasion which overcomes the

4  perpetrator's reluctance).

5      **Tenth Affirmative Defense:  Apportionment of Fault.**

6      Mr. Wolff contends that, to the extent that plaintiffs can prove the elements of

7  their claims (which Mr. Wolff contends they cannot), for example, on the basis that

8  any of Homestore's revenues may have been recognized in contravention of GAAP,

9  the evidence from the testimony of the witnesses on the parties' witness lists and

10  exhibits including emails and other documents produced by Homestore and PwC will

11  show that responsibility and fault for any such mistakes rests with persons other than

12  Mr. Wolff including, but not limited to, members of the Finance Department (such as

13  Mr. Giesecke, Mr. Shew, Mr. DeSimone, and Mr. Kalina), the Audit Committee, other

14  Homestore employees who engaged in allegedly questionable activities (such as Peter

15  Tafeen, Sophia Losh, Clayton Chan, Thomas Vo, and Jessica McClellan, among

16  others), and third parties such as PwC, AOL, Cendant, and L90, among others.

17      **Eleventh Affirmative Defense:  Satisfaction of Claim/Reduction of Liability**

18      **Based on Prior Settlements.**

19      Plaintiffs in this case have obtained cash settlements in this case in the

20  approximate amount of $47,340,125.64, plus 20 million shares of Homestore stock

21  which were collectively worth $82 million on the day the Court approved Homestore's

22  settlement (based on the closing price on that day).  In addition, Merrill Lynch paid

23  $1,875,000 to Homestore shareholders in settlement of securities claims brought

24  against it in the case of <u>In re Merrill Lynch Research Reports Securities Litigation</u>,

25  Master File No. 02 MDL 1484 (JFK) (S.D.N.Y.).  Finally, Mr. Wolff has settled

26  related SEC claims in the total amount of $11,900,462.35, which funds will be made

27  available to Homestore shareholders through the SEC's fair fund program.  Thus, any

28

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**
       27

1  verdict or judgment against Mr. Wolff in this action must be reduced by no less than

2  the collective amount of $143,115,587.99.

3       **Twelfth Affirmative Defense:  Waiver and Release.**

4       Cendant Corporation, a defendant and previously a purported member of the

5  "Dismissed Defendants" subclass in this case, expressly represented in court filings

6  that, as part of its settlement in this case, it would not participate in any verdict or

7  judgment against Mr. Wolff.

8       Furthermore, in settling their claims against Time Warner in this case, plaintiffs

9  specifically released Time Warner, its predecessors, *and its present and former*

10 *shareholders*.  This release is set forth in the Stipulation and Agreement of Settlement

11 between plaintiffs in this case and Defendant Time Warner, Inc., and, without

12 qualification, in the notice of pendency of the settlement provided to class members

13 and in the claims forms signed by members of the plaintiff class who submitted such

14 forms in response to this settlement.  By his own testimony, the testimony of his

15 financial advisor, and/or exhibits constituting illustrative copies of Mr. Wolff's

16 retirement account statements, Mr. Wolff will establish that he was a shareholder of

17 AOL Time Warner.

18      **Thirteenth Affirmative Defense:  Statute of Limitations.**

19      Mr. Wolff contends that the purported claims of at least certain purported

20 members of the class must be barred by the statute of limitations.  Simply by sake of

21 example, plaintiffs contend that certain parties (such as AOL (which, for other reasons,

22 Mr. Wolff contends cannot be a member of the class)) participated in transactions with

23 Homestore more than one year prior to the commencement of this lawsuit.

24      **C.**    **Third Party Plaintiffs And Defendants**

25      There are no third parties in this action.

26      / / /

27      / / /

28      / / /

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**     28

## VIII.  REMAINING TRIABLE ISSUES

All of the claims and defenses identified above remain to be tried.

## IX.  DISCOVERY

All discovery is complete.

## X.  TRIAL EXHIBITS

All disclosures under F.R.Civ.P. 26(a)(3) have been made.  The joint exhibit list of the parties has been filed herewith under separate cover as required by L.R. 16-5. All exhibits may be admitted without objection, except those exhibits listed below:

### A.  Plaintiff's Objections

Plaintiff's objections are separately stated and attached hereto as Exhibit A.

### B.  Wolff's Objections

Wolff's objections are separately stated and attached hereto as Exhibit B.

## XI.  WITNESS LIST

Witness lists of the parties have heretofore been filed with the Court.  Only the witnesses identified in those lists will be permitted to testify (other than solely for impeachment).  Each party intending to present evidence by way of deposition testimony has marked such depositions in accordance with L.R. 16-2.7.  For this purpose, the following depositions shall be lodged with the Clerk as required by L.R. 32-1:

### A.  Plaintiff's Designations

Plaintiff designates the following witnesses whose testimony may be presented by deposition and previous trial testimony:

1.  John Giesecke
2.  William Kelvie
3.  Joseph Shew
4.  Peter Tafeen
5.  Stuart Wolff
6.  Adam Zurofsky

## B.   **Wolff's Designations**

Defendant Wolff designates the following witnesses whose testimony may be presented by deposition testimony:

1.   Barbara Alexander

2.   John Althoff

3.   Jennifer Campos

4.   John Costello

5.   Gordon Davidson

6.   Robert Fisher

7.   John Giesecke

8.   Paul Gompers

9.   Katherine Graham

10.   Joe Hanauer

11.   Phillip Harkins

12.   Teri N. Hollander

13.   Norman Jacobs

14.   Christian Jester

15.   Bill Kelvie

16.   Paul Kepple

17.   Allan Kleidon

18.   Kenneth Klein

19.   Allan Merrill

20.   Robert Page

21.   Clifford Pike

22.   Walter Rush

23.   Mary Elizabeth Shelton Rose

24.   Joseph Shew

25.   Michelle Stalick

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                           30

26.   Jack Sum

27.   Richard Withey

28.   Stuart Wolff

29.   Adam Zurofsky

### C.   Plaintiff's Objections

Pursuant to L.R. 32-1, 51-5 and this Court's Local Rule 10, Plaintiff's will submit specific objections to deposition testimony on January 25, 2011.  Plaintiff objects to the presentation of testimony by deposition of the following witnesses:

- **Paul Gompers; Phillip Harkins; Norman Jacobs; and Walter Rush (Expert witnesses retained and/or disclosed by Mr. Wolff)**

  **Basis For Objection**: Barring extraordinary circumstances, a party is not permitted present expert deposition testimony in lieu of live testimony. *See, e.g., Carter Wallace, Inc. v. Otte*, 474 F.2d 529, 535-36 (2d Cir. 1972) (unlike the typical witness whose involvement with the case is often involuntary, a party ordinarily has the opportunity to choose the expert witness whose testimony he desires and to arrange for the expert to appear and testify at the trial); *McDermott v. Liberty Mar., Corp.*, 2010 U.S. Dist. LEXIS 96992, at ** 2-4 (E.D.N.Y. September 16, 2010) (party has the "right to prepare their cross-examination questions in accordance with standard trial practice, to consult their own experts about the testimony provided from the depositions, and to prepare a trial strategy based on the information supplied by [party's] experts"); *Holmes v. Merck & Co., Inc.*, 2006 U.S. Dist. LEXIS 42370, at *7 (D. Nev. Jun. 22, 2006) ("[B]ecause a retained expert witness usually has no involvement with the case other than his willingness to review the case and testify as an expert, a party is likely to have the ability to select an expert witness who will or should be available to testify at trial."); *Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co.*, 2000 U.S. Dist. LEXIS 997, at *5-13 (D. Del. Jan. 13,

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**

2000) (noting the differences between the unavailability of a fact witness and the unavailability of an expert witness).

- **Allan Kleidon; Clifford Pike (Expert witnesses retained by PWC)**

    - In addition, to the reasons discussed above, Defendant should not be permitted to call expert witnesses previously designated by former defendants because Plaintiff did not have a similar motive to develop the testimony of these witnesses during deposition. *See* Fed. R. Evid. 404 (b).

- **John Costello (Former Plaintiff expert witnesses designated to testify regarding PWC's conduct and not disclosed in expert disclosures in this trial)**

    **<u>Basis For Objection</u>**:  A party is not permitted present testimony of an expert witness whom the opposing party initially designated for trial, but subsequently decides not to call.  *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1046 (E.D. Cal. 2002); *Lehan v. Ambassador Programs, Inc.*, 190 F.R.D. 670, 672 (E.D. Wash. 2000); *see also Otsuka v. Polo Ralph Lauren Corp.,* 2010 U.S. Dist. LEXIS 25017, at *4 (N.D. Cal. Mar. 17, 2010) (J. Illston) (once party commits to not calling expert, opposing party not allowed to introduce expert witness testimony).

- In addition Plaintiff objections to the use of deposition testimony for any witness within the subpoena power of this Court.

    **D.     <u>Mr. Wolff's Objections</u>**

    Defendant Wolff objects to the presentation of testimony by deposition and/or prior trial testimony of the following witnesses:

    Reserving the right to object to specific questions and/or responses from any deposition or other trial testimony offered by plaintiffs, Defendant Wolff objects to *plaintiffs' presentation* in their case in chief of testimony by deposition and other trial testimony of the following witnesses – in their entirety – on the ground that, while

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                     32

unavailable to Mr. Wolff (who may therefore use deposition testimony in support of his case), these witnesses are not unavailable to plaintiffs because the witnesses personally (or through Homestore) agreed in Court-approved and Court-supervised settlements to cooperate with plaintiffs in this case (including the provision of testimony at trial if requested by plaintiffs):  **John Giesecke; Joseph Shew; Peter Tafeen; William Kelvie; and, Adam Zurofsky**.

## XII.  MOTIONS

### A.    Plaintiff's List of Motions *in Limine*

The following motions *in limine* are contemplated by Plaintiff:

1.    Exclude Reference To or Evidence Of Class Representative's Financial Condition, Investments, Fee Arrangements, and/or Other Litigation.

2.    Exclude Any Evidence Regarding Individual Reliance.

3.    Exclude Evidence Related to CalSTRS' Settlements with Other Parties.

4.    Exclude Evidence Related to Any and All Settlement Negotiations Between the Parties Including Documents Exchanged as Part of Settlement Negotiations Pursuant to FRE 408.

5.    Exclude Character Evidence Regarding Wolff Pursuant to FRE 404(a).

6.    Exclude Evidence of Witness Phillip Harkin's Lay Opinions Regarding Wolff's Involvement at Homestore.

7.    Exclude expert deposition testimony in lieu of live testimony.

8.    Admit Former Testimony and Sworn Statements Pursuant to FRE 804(b)(1).

9.    Permit Plaintiff To Admit Evidence of the 64 Transactions in the Year 2000 Restatement and All 57 Transactions in Year 2001 Identified by Homestore.

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                                                 33

10.     Exclude Witnesses From Courtroom During Trial.

11.     That The Jury Be Instructed That Wolff Must Be Found Liable For 10b-5 Violations For The Second And Third Quarter Of 2001.

12.     Exclude Arguments Or Evidence That Stuart Wolff Be Found Not Liable For 10b-5 Violations For The Second And Third Quarter Of 2001.

13.     Exclude All Deposition Testimony Of Witnesses Who Are Within Subpoena Power Of The Court.

**B.**     <u>Mr.Wolff's List of Motions</u>

The following motion practice, including motions *in limine,* is presently contemplated by Defendant Wolff:

1.     Motion to decertify the subclass of so-called "Dismissed Defendants" and/or exclude therefrom AOL Time Warner, David Colburn, Eric Keller, Cendant Corporation, Richard Smith, L90, Inc., and all other individuals and entities associated with them;

2.     Motion to exclude from the plaintiff class all persons who received a distribution from the settlement with Time Warner;

3.     Motion to preclude CalSTRS and the class from asserting any claims against Mr. Wolff based on alleged "insider trading" and/or presenting evidence thereon;

4.     Joint or Stipulated Petition/Request of the parties for a writ of habeas corpus or similar relief, permitting Mr. Wolff to appear and testify at the trial of this action (and to appear in civilian clothing without indicia of incarceration);

5.     Motion to exclude the March 29, 2002 Investigation Report of the Audit Committee of Homestore.com, Inc., all Exhibits and Appendices thereto, as well as all assertions and conclusions set forth therein (and to prevent references to the same);

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                   34

6.      Motion to exclude Homestore's financial restatement of revenues and otherwise, including all documents setting forth or referring to such restatement (and to prevent references to the same);

7.      Motion to exclude the plea agreement of Stuart H. Wolff, as well as all statements made and papers filed in relation to such plea agreement (and to prevent references to the same and to Mr. Wolff's incarceration);

8.      Motion to exclude the all pleadings, papers, and testimony from past criminal and SEC proceedings against Mr. Wolff, including the consent/settlement agreement and final judgment in the SEC proceeding (and to prevent references to the same);

9.      Motion to exclude the purported expert testimony of Alfred Osbourne;

10.     Motion to exclude the purported expert testimony of Ruben Davila;

11.     Motion to exclude the purported expert testimony of Carla Hayn;

12.     Motion to exclude the purported expert testimony of Jane Nettesheim;

13.     Motion to exclude evidence and testimony of alleged "aggregate damages" and to require proof of dollar-per-share damages;

14.     Motion to exclude evidence and testimony of the so-called "constant-percentage" method of calculating damages;

15.     Motion to exclude evidence and testimony of Lead Plaintiff's individual alleged "losses" until after trial;

16.     Motion to exclude cumulative expert testimony (e.g., Nettesheim/Hayn and Osbourne/Davila);

17.     Motion to exclude legal conclusions from expert testimony;

18.     Motion to exclude Joseph Shew's "Notes";

19.     Motion to exclude evidence of Stuart Wolff's stock sales and financial condition;

20.     Motion to exclude criminal information/complaints, guilty pleas, and court transcripts related to such pleas, and SEC complaints and settlements against and by former Homestore personnel (and to prevent references to the same);

21.     Motion to exclude references to past assertions of the Fifth Amendment by Mr. Wolff and other witnesses;

22.     Motion to exclude references to accounting or corporate "scandals" such as Enron, Worldcom, Madoff, etc.;

23.     Motion to exclude evidence or references to insurance or indemnity;

24.     Motion to exclude speculation concerning SPD, LLC and Translations.com;

25.     Motion to exclude evidence of and references to Lead Plaintiff as a pension fund for teachers, or other references to plaintiffs as "teachers";

26.     Motion to prevent references to plaintiffs as "victims";

27.     Motion to confine plaintiffs' evidence and arguments to the 14 transactions identified by plaintiffs in response to an earlier scheduling order;

28.     Motion to exclude references to laws and regulations enacted after 11/14/01, such as the Sarbanes-Oxley Act; and,

29.     Request for special written interrogatories and special verdict.

In addition, Mr. Wolff reserves the right to bring other and additional motions depending on the nature of plaintiffs' proof and/or future events, such as a motion to decertify the class in whole or in part based on plaintiffs' failure of proof; motion for judgment as a matter of law; motion for vacating or for reduction of any verdict on any grounds including, but not limited to, prior settlements in favor of plaintiffs; motion to establish an appropriate post-trial claims process, if necessary, taking into account Mr. Wolff's rights under the law to address issues relevant to individual plaintiffs' alleged reliance and damages.

/ / /

/ / /

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**

## XIII. **BIFURCATION**

### A.   **Defendant Wolff's Statement**

Defendant Wolff believes that judicial economy and efficiency will be best served by bifurcating and trying first the issue of whether Homestore's stock traded in an "efficient market" during all or any part of the time period between January 1, 2000 through December 21, 2001.[1]

The efficient market issue is one that plaintiffs must prove in order to establish whether they may proceed with a rebuttable presumption of reliance, or whether they must prove reliance on an individual basis.  See Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999).  The United States Supreme Court and other courts have stated that, where plaintiffs cannot so establish their right to a presumption of reliance, they may not proceed with their claims as a class action.  See Basic, Inc. v. Levinson, 485 U.S. 224, 242 (1988).  Furthermore, in the absence of an efficient market, the "stock market evidence" referenced by plaintiffs below will lack foundation as, untethered from an efficient market, movements in stock prices are essentially meaningless as a measure of investors' reaction to information.

Therefore, if plaintiffs are unable to prove that Homestore's stock traded in an "efficient market" during all or part of the time frame in question here (and, contrary to plaintiffs' assertion, this analysis is not limited solely to the so-called "Cammer factors" mentioned below), then it is likely that the remainder of case would not have to be tried at all or, at least, any remaining trial would be very significantly reduced in scope and in length.  In the absence of an efficient market and the so-called "fraud on the market" presumption reliance, the case would be reduced to an individual claim

_____

[1] Note that, in addition to making this request for bifurcation, Mr. Wolff reserves the right, if necessary, to have the Court establish an appropriate post-trial claims process by which Mr. Wolff could challenge individual class member's claims on issues related to lack of reliance, damages, etc.  See, e.g., In re Worldcom, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 2603 (S.D.N.Y. 2005).

by CalSTRS against Mr. Wolff (not a class action), and the method and manner of proof of critical issues such as reliance, materiality, loss causation and damages would be significantly different.  (In this regard, plaintiffs are also flatly incorrect in their description of "loss causation" as an "affirmative defense" – the controlling statute clearly and unambiguously states that "**the plaintiff shall have the burden** of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).)  Thus, bifurcation of the "efficient market" issue offers the Court and the parties the best opportunity for a swift resolution of a critical threshold issue that will have a significant impact on the need for and nature of any further trial.

## B.    <u>Plaintiff's Statement</u>

Mr. Wolff proposes to bifurcate the trial into two phases, splitting the issue of whether there was an "economically efficient market" from the rest of the trial.  This plan would result in an extensive duplication of evidence, the addition of burdensome and unnecessary costs, create a risk of inconsistent results, and greatly prolong the length of the trial.

Mr. Wolff's plan would, for example, require the parties to present duplicative expert testimony regarding stock price evidence during both proposed phases.  Wolff's "efficient market" phase would entail an analysis of the five factors outlined in *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J.1989) ("*Cammer* Factors").  The *Cammer* Factors require Plaintiffs to provide "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 963-964 (C.D. Cal. 2000).

Regardless of the outcome of this preliminary stage, Wolff would additionally present stock market evidence in support of a **loss causation affirmative defense** during the remainder of the trial.  To prove this affirmative defense, Wolff would

---

**JOINT PRETRIAL CONFERENCE ORDER**
**Case No. 01-CV-11115 RSWL**                                    38

likely call the same expert witnesses to discuss the same stock market evidence. Calling the same witness on two different occasions for intertwined issues does not comport with the purposes of Fed. R. Civ. Proc. 42(b). Therefore, bifurcation in the proposed manner would only prejudice the Plaintiff and inconvenience the jury.

## XIV. **STATEMENT OF COMPLIANCE**

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this pretrial conference order shall supersede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

Date: January 3, 2011          COTCHETT, PITRE & McCARTHY


BY:  /s/_____
          NANCY L. FINEMAN
          *Counsel for Lead Plaintiff CalSTRS and the Class*

Date: January 3, 2011          PAUL, HASTINGS, JANOFSKY & WALKER LLP


BY:  /s/_____
          HOWARD M. PRIVETTE
          *Counsel for Defendant Stuart H. Wolff*

LEGAL_US_W # 66824947.1



IT IS SO ORDERED:

Date:  January 20, 2011

Signed:   RONALD S.W. LEW