JOSEPH W. COTCHETT (#36324)
NANCY L. FINEMAN (#124870)
ARON K. LIANG (#228936)
DANIEL R. STERRETT (#260290)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California  94010
(650) 697-6000

*Counsel for Lead Plaintiff CalSTRS
and the Class*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **In re HOMESTORE.COM, INC. SECURITIES LITIGATION** ) ) ) | Master File No. 01-CV-11115 RSWL (CWx) |
| ——————————————— ) ) ) | **PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW** |
| This Document Relates To: ) ) ) ) ) | |
| ALL ACTIONS. ) ) ) | **Date:      April 20, 2011** **Time:      10:00 a.m.** **Judge:     Hon. Ronald S.W. Lew** **Courtroom: 21, 312 North Spring Street            Los Angeles, CA 90012** |
| ——————————————— ) | |

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY, LLP

# TABLE OF CONTENTS

**PAGE NO.**

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   The Evidence Supports A Finding Of Loss Causation With Respect To Each Of The Corrective Disclosures. . . . . . . . . . . . . . . . . 2

        1.   The October 3, 2001 and November 1, 2001 Disclosures Began To Reveal The Truth About Homestore's Fraud. . . . . . 2

        2.   The November 1 Announcement Provided New Information Concerning Homestore's Revenues . . . . . . . . . . 7

        3.   Nettesheim's Methodology Supports The Jury's Findings. . . . 8

    C.   Plaintiff Established Reliance. . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.   The Record Establishes That Wolff Made False Or Misleading Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.   The Jury's Findings Regarding Statements 11 and 12 Are Supported By The Evidence. . . . . . . . . . . . . . . . . . . . . 11

        2.   The Jury's Findings Regarding Statements 17, 18 and 21 Are Supported By The Evidence. . . . . . . . . . . . . . . . . . 14

    E.   There Is Sufficient Evidence to Establish Wolff's 20(a) Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

# TABLE OF AUTHORITIES

**PAGE NO.**

## CASES

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*
597 F. 3d 330 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Basic Inc. v. Levinson*
485 U.S. 224 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bazemore v. Friday*
478 U.S. 385, 106 S. Ct. 3000 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dura Pharms., Inc. v. Broudo*
544 U.S. 336, 125 S. Ct. 1627 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Freeland v. Iridium World Commc'ns, Ltd.*
233 F.R.D. 40 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Howard v Systems, Inc.*
228 F. 3d 1057 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Cendant Sec. Litig.*
109 F. Supp. 2d 235 (D.N.J. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Gaming Lottery Sec. Litig.*
2000 U.S. Dist. LEXIS 1558 (S.D.N.Y. Feb. 16, 2000). . . . . . . . . . . . . . . . 9

*In re Imperial Credit Indus., Inc. Sec. Litig.*
252 F. Supp. 2d 1005 (C.D. Cal. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Motorola Sec. Litig.*
505 F. Supp. 2d 501 (N.D. Ill. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re New Century*
588 F. Supp. 2d 1206 (C.D. Cal. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Oracle Corp. Secs. Litig.*
627 F. 3d 376 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Remec Inc. Sec. Litig.*
702 F. Supp. 2d 1202 (S.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Vivendi Universal, S.A., Sec. Litig.*
634 F. Supp. 2d 352 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Vivendi Universal, S.A. Sec. Litig.*
2011 U.S. Dist. Lexis 17514 (S.D.N.Y. Feb. 17, 2011). . . . . . . . . . . . . . . 3, 9

*In re Williams Sec. Litig.-WCG Subclass*
558 F. 3d 1130 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re ZZZZ Best Sec. Litig.*
864 F. Supp. 960 (C.D. Cal. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

**PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)**

ii

*Josephs v. Pac. Bell*
    443 F.3d 1050 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Lerch v. Citizens First Bancorp, Inc.*
    144 F.R.D. 247 (D.N.J.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Metzler Investment GMBH v. Corinthinan Colleges, Inc.*
    540 F. 3d 1049 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Reeves v. Sanderson Plumbing Prods., Inc.*
    530 U.S. 133, 120 S.Ct. 2097 (2000). . . . . . . . . . . . . . . . . . . . . . . . . 1

*Schaefer v. Overland Exp. Family of Funds*
    169 F.R.D. 124 (S.D. Cal. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Schlanger v. Four-Phase System, Inc.*
    555 F. Supp. 535 (S.D.N.Y 1982).. . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sparling v. Daou (In re Daou Sys.)*
    411 F.3d 1006 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*White v. Ford Motor Co.*
    312 F.3d 998 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)**

## I.   <u>INTRODUCTION</u>

Plaintiff CalSTRS ("Plaintiff"), respectfully requests that Defendant Stuart Wolff's ("Wolff") renewed motion for judgment as a matter of law be denied. Wolff fails to meet his heavy burden of setting aside the jury's findings.  The totality of the evidence presented at trial supports the jury finding that Plaintiff proved: (1) loss causation with respect to the corrective disclosures; (2) market-wide reliance; (3) Wolff made false and misleading statements regarding Homestore's revenue and there is substantial evidence to support the jury's findings on Statement Nos. 11, 12 (2000) and 17, 18, and 21 (Q3 2001); and (4) Wolff was a "control person" for certain fraudulent statements made by other Homestore officers and there is substantial evidence to support the jury's findings on Statement Nos. 14, 15, and 21.

## II.   <u>ARGUMENT</u>

### A.   <u>Legal Standard</u>

When reviewing a motion for judgment as a matter of law, the court considers the record as a whole and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097 (2000).  The court will instead "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).  In other words, the test is whether "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002) (footnote with case citations omitted).

/ / /

/ / /

/ / /

/ / /

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

## B. The Evidence Supports A Finding Of Loss Causation With Respect To Each Of The Corrective Disclosures

At trial, the jury found three "corrective disclosures" unveiled the effects of Wolff's past misrepresentation.[1]

Wolff challenges the jury's findings and asserts that the evidence offered at trial does not support the necessary elements of loss causation. He offers three arguments in support of his position. First, Wolff claims that there is no evidence that as a result of the October 3, 2001 and November 1, 2001 disclosures the market learned of the fraudulent conduct. Second, Wolff claims that the November 1, 2001 disclosure did not reveal "new news" concerning Homestore's Revenues. Third, Wolff clams that the jury's findings is not supported because Plaintiffs' expert Jane "Nettesheim did not assess the monetary effect of" certain negative information about Homestore. As discussed below, each of these arguments fails because Ms. Nettesheim's testimony and the evidence in the record support the jury's finding.

## 1. The October 3, 2001 and November 1, 2001 Disclosures Began To Reveal The Truth About Homestore's Fraud

Wolff's argument that the October 3 and November 1, 2001 statements are not corrective disclosures is based on an improper reading of *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005) and Ninth Circuit authority and a selective interpretation of the evidence presented to the jury. As Judge Pregerson explained, *Dura* "did not . . . indicate what form a disclosure must take, how

---

[1] The jury found three corrective disclosures were contained in: (1) An October 3, 2001 Homestore Press Release: "Homestore Estimates Third Quarter Results" (Declaration of Daniel R. Sterrett in Support of Plaintiff's Opposition to Stuart Wolff's Renewed Motion for Judgment as a Matter of Law or for Partial Judgment as a Matter of Law ("Sterrett Decl."), Exh. 9, Trial Exhibit 2080); (2) A November 1, 2001 Homestore Press Release: "Homestore Reports Third Quarter Results" Sterrett Decl., Exh. 10, Trial Exhibit 2083; and (3) A December 21, 2001 Homestore Press Release: "Homestore Announces Accounting Inquiry." Sterrett Decl., Exh. 11, Trial Exhibit 2085.

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)    2

1   completely it should reveal previously misrepresented or concealed information,

2   or how specifically it must refer to that information." *In re New Century*, 588 F.

3   Supp. 2d 1206, 1236 (C.D. Cal. 2008) citing *In re Motorola Sec. Litig.*, 505 F.

4   Supp. 2d 501, 540 (N.D. Ill. 2007).  Further, the truth need not be revealed to the

5   market through a single disclosure.  *See Sparling v. Daou (In re Daou Sys.)*, 411

6   F.3d 1006, 1026-1027 (9th Cir. 2002); accord *Freeland v. Iridium World*

7   *Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006)("[R]eading *Dura* to require

8   proof of a complete, corrective disclosure would allow wrongdoers to immunize

9   themselves with a protracted series of partial disclosures."); *see also In re Vivendi*

10  *Universal, S.A. Sec. Litig.*, 2011 U.S. Dist. Lexis 17514 at ** 127-144 (S.D.N.Y.

11  Feb. 17, 2011) (denying 50(b) motion where jury found nine corrective

12  disclosures); *In re: Cendant Sec. Litig.*, 109 F. Supp. 2d 235, 265-266 (D.N.J.

13  2000) (multiple misstatements and omissions can have a cumulative effect on the

14  price inflation of a stock).

15         Here, the jury's finding that the <u>October 3, 2001</u> press release was a

16  corrective disclosure is supported by the totality of evidence presented at trial.  On

17  <u>October 3, 2001</u>, Homestore surprised the market when it issued a press release

18  stating that it was reducing its projected revenue and earnings for the third quarter

19  of 2001.  Declaration of Daniel R. Sterrett in Support of Plaintiff's Opposition to

20  Stuart Wolff's Renewed Motion for Judgment as a Matter of Law or for Partial

21  Judgment as a Matter of Law ("Sterrett Decl."), Exh. 9, Trial Exhibit 2080.

22  Homestore projected that its third quarter revenue would only be between $118

23  and $144 million.  *Id.*

24         Despite Wolff's assertion to the contrary, the market did not regard the

25  <u>October 3, 2001</u> press release as a mere "earnings miss."  The testimony at trial

26  showed that the <u>October 3, 2001</u> press release was the first time that the market

27  got a glimpse into the true condition of Homestore's financial condition, and the

28  market began to understand that the company's previous revenue reports were

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)                    3

misstatements.  As Plaintiffs' expert Jane Nettesheim testified, "this is the first time . . . that we see in news reports and analysts reports, questioning of the reported revenues."  Sterrett Decl., Exh. 1, at 104:19-21.  Ms. Netthesheim also testified that this is the first time in the class period that the analysts downgraded their revenue projections for the company.  Sterrett Decl., Exh. 1, at 103:24-104:1; 107:25-108:9.

Further, the market was surprised by the sudden downturn in the company's revenues.  Ms. Nettesheim testified that "less than a month earlier on September 6th, 2001, the company had reconfirmed guidance for that quarter.  So, even though the quarter was . . . more than two-thirds complete, the company had reaffirmed its previous guidance and the market's expectations for that quarter."  Sterrett Decl., Exh. 1, at 103:13-17.  Ms. Nettesheim testified that because of the sudden change in revenue results from the September 6 disclosure to the October 3, 2001 disclosure, "[a]nalysts were surprised."  Sterrett Decl., Exh. 1, at 104:21.  Ms. Nettesheim also testified there was "commentary by analysts and in the news that this could not have all been due to the events of September 11th, because that was too close to the end of the quarter for this large change."  Sterrett Decl., Exh. 1, at 108:24-109:2.  Further, Ms. Nettesheim described the sharp decline in the stock value that followed the disclosure.  Sterrett Decl., Exh. 1, at 107:19-22 (the percentage decline net of market and industry effects was 18.7 percent and the dollar drop was $1.31 a share).  In short, the evidence demonstrates that as the truth began to be revealed, the market started to learn about the fraud and question the true financial condition of the company.

Ms. Nettesheim's testimony also establishes that the November 1, 2001 press release was a corrective disclosure.  On November 1, 2001, after market close, Homestore issued another press release entitled "Homestore Reports Third Quarter Results," predicting even lower revenues than previously announced:

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)          4

Homestore.com, Inc., the leading supplier of technology and online media to the home and real estate industry, today reported revenue of $116.1 million and a pro forma net loss, excluding certain charges, of $6.9 million or $0.06 per share for the third quarter 2001. Sterrett Decl., Exh. 10, Trial Exhibit 2083.

Ms. Nettesheim testified that the market had doubts about the quality of Homestore's previously reported revenue:

There was commentary in the news and by analysts that they wouldn't be surprised if there was some -- ***something wrong with the previous accounting for revenues***, because they were quite surprised at how quickly and sort of -- how quickly this reversal of fortune occurred, how much the decline in advertising revenues was, and so there was ***some suspicion that earlier revenues had perhaps not been booked appropriately***.

Sterrett Decl., Exh. 1, at 112:3-10 (emphasis added). Her testimony also establishes that there was (1) an unexpected significant shortfall in reported advertising revenue for Q301, and (2) significantly reduced guidance for Q401 and 2002 (Sterrett Decl., Exh. 1, at 111:2-11).

Moreover, Ms. Nettesheim's testimony on cross examination supports the jury finding that the <u>November 1, 2001</u> press release was a corrective disclosure:

Q.    And isn't it true that none of those analyst reports, or newspaper articles, or whatever they might be, said anything about there might be accounting fraud at Homestore?

A.    That's not true.

Q.    Did anyone say -- did any of those analysts say that they believed there might be accounting fraud?

/ / /

/ / /

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)      5

A.      They didn't use the words accounting fraud, but some of the

analysts commented that they thought maybe some earlier

revenues had been -- had not been accounted for properly.

Sterrett Decl., Exh. 1, at 153:11-19.

The evidence establishes that the <u>November 1, 2001</u> press release further disclosed the fraud and that the market was reacting to the company and Wolff's fraud.  The jury's finding that the <u>October 3</u> and <u>November 1, 2001</u> press releases were corrective disclosures is well-supported by the evidence.

Wolff also asserts that the corrective disclosures are similar to the disclosures found inadequate in *Metzler Investment GMBH v. Corinthinan Colleges, Inc.*, 540 F. 3d 1049 (9th Cir. 2008) (decided on a motion to dismiss). Wolff reads *Metzler* too broadly.  In *Metzler*, in alleging loss causation, the plaintiff relied on a news story revealing a Department of Education investigation at a single campus and the placement of that campus on "reimbursement status" as a result of improper financial aid practices.  *Id*. at 1063.  The story simultaneously noted that the investigation at that campus "d[id] not affect the status of other Corinthian schools." *Id*.   Moreover, the complaint did not "allege that all, or even some appreciable number, of Corinthian school's were being investigated or placed on reimbursement status." *Id*.  The Ninth Circuit found that loss causation was not properly pled "where a defendant's disclosure reveals a 'risk' or 'potential' for widespread fraudulent conduct." *Id*. at 1064.  Here, unlike *Metzler*, Plaintiff demonstrated at trial that Homestore's corrective disclosures revealed more than a "risk" or "potential" for fraudulent conduct.  As Ms. Nettesheim's testimony established, the <u>October 3</u> and <u>November 1, 2001</u> press releases were

/ / /

/ / /

/ / /

/ / /

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)                                    6

corrective disclosures where the true information began to come out and the

market began to correct itself.[2]

## 2.   The November 1 Announcement Provided New Information Concerning Homestore's Revenues

Wolff's argument that the November 1, 2001 press release merely

confirmed the October 3, 2001 press release is not supported by the record.

Ms. Nettesheim's testimony establishes that the November 1, 2001 press release

revealed new information that strengthened the market's growing belief that there

was fraud at Homestore:

> Q:   How about a situation where a company announces that it's going to
> make revenues in the approximate range of 114 to 118 million, and
> about three weeks later says the actuals are 116 million; is that new
> news in the second disclosure?
>
> A.   If you're referring to . . . the November 1st disclosure that we've
> discussed extensively, the -- as I said at the very beginning, the
> company reported revenues that was within the range of its earlier
> guidance.  But it -- there were *lots of other things that came out on
> that day that analysts and market commentators found to be very
> bad news*.

Sterrett Decl., Exh. 1, at 181:17-182:2 (emphasis added); *see also* Sterrett Decl.,

Exh. 1, at 111:2-11 ("The disappointing news in the press release and also in other

information that was put out by the company at this time, was that the shortfall

was in advertising revenues, that the company was also reducing its guidance").

---

[2]   Wolff's reliance on *In re Oracle Corp. Secs. Litig.*, 627 F. 3d 376 (9th Cir. 2010) is also misplaced.  Ms. Nettesheim's testimony establishes that the market's negative reaction to the disclosures was based on the fact that market participants believed the sudden change in revenue numbers was the product of previous misstatements, not "poor financial performance generally."  That Ms. Nettesheim did not identify the specific reports she relied on at trial, or that Defendant's expert had a different opinion goes to the weight of the testimony, and is not the function of the court to weigh the evidence.

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

**PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)**                    7

1   Further, Ms. Nettesheim testified that on <u>November 2, 2001</u>, the day after the

2   announcement, more than 24 million shares were traded, which amounted to an

3   "extraordinarily busy trading day" Sterrett Decl., Exh. 1, at 111:19-23 ("average

4   daily volume in the class period was closer to approximately one and a half

5   million shares").  She also testified that following the <u>November 1</u> disclosure,

6   analysts significantly reduced their revenue projections.  Sterrett Decl., Exh. 1, at

7   111:2-11.  Obviously the analysts would not have reduced revenue projections

8   unless the <u>November 1, 2001</u> disclosure revealed new information.

9         This testimony further establishes that the market was reacting to new

10   information not disclosed in the <u>October 3, 2001</u> disclosure.  Further, as discussed

11   herein, following the <u>November 1</u> disclosure market commentators reported the

12   fact that they believed that earlier revenue had not been accounted for properly.

13   Sterrett Decl., Exh. 1, at 153:11-19.  This testimony, and the totality of the

14   evidence presented, supports the jury's conclusion that the <u>November 1, 2001</u>

15   press release was a "corrective disclosure."

16         **3.     <u>Nettesheim's Methodology Supports The Jury's Findings</u>**

17         Wolff asserts that Ms. Nettesheim's analysis is flawed because it does not

18   incorporate industry-wide events (such as the 9/11 tragedy, and a decline in the

19   economy generally and the market for internet advertising) and other non-fraud

20   company specific information.  Wolff's self-serving interpretation of the evidence

21   is not supported by the law or evidence.  *See, e.g.*, *Bazemore v. Friday*, 478 U.S.

22   385, 400, 106 S. Ct. 3000 (1986) (the failure to include a variable in a regression

23   analysis affects the probative value of the analysis and not its admissibility).

24         Most courts, including this Court in its <u>January 25, 2011</u> Order on the

25   parties' motions *in limine*, have recognized that event studies, such as the one

26   Ms. Nettesheim performed in this case, are not only appropriate but usually

27   required to screen out market-wide and industry-wide downturns from those

28   specific to the company itself.  "It is an expert that produces the almost obligatory

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)                    8

'event study' that begins by isolating stock declines associated with market-wide and industry-wide downturns from those specific to the company itself." *See In re: Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) (summary judgment denied). "The event study method is 'an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation.'" *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003); *In re Gaming Lottery Sec. Litig.*, 2000 U.S. Dist. LEXIS 1558 at *3 (S.D.N.Y. Feb. 16, 2000). *See In re Vivendi*, 2011 U.S. Dist. LEXIS 17514 at ** 141-143 (S.D.N.Y. Feb. 17, 2011).

Wolff has no legitimate challenge to Ms. Nettesheim's regression analysis and use of an event study. At trial Ms. Nettsehim explained that she: "incorporated in [her] regression analysis a market index and an industry index. So, to the extent that there were factors affecting all stocks in a -- in the economy and stocks in my industry index, I've taken out that part of it." Sterrett Decl., Exh. 1, at 105:14-17 (emphasis added); *see also id.* at 90:15-94:1 (describing regression analysis and event study). Ms. Nettsehim also testified that she did a "regression analysis on each day of the class period." Sterrett Decl., Exh. 1, at 198:19-20. She also explained that her analysis factored nation-wide events, like the September 11 tragedy. Sterrett Decl., Exh. 1, at 105:15-17. Moreover, Wolff's purported authority does not undermine the validity of Ms. Nettesheim's methodology.[3]

---

[3]     *In re Williams Sec. Litig.-WCG Subclass*, is inapposite because the expert did not a perform a complete regression analysis to support his conclusions regarding the company's bonds. 558 F. 3d 1130, 1135, fn. 3 (10th Cir. 2009). The other cases cited by Wolff are inapposite because the experts did not attempt to account for other possible causes, *i.e.*, general economic and industry-specific news that might account for the decline in stock value. *In re Remec Inc. Sec. Litig.* 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010); *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F. 3d 330, 344 (5th Cir. 2010) (did not factor in industry factors such as increased labor costs, consolidated customer base, fiercely competitive environment). Ms. Nettesheim's analysis took these factors and other market factors into account. Sterrett Decl., Exh. 1, at 105:14-17.

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

**PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)                     9**

1   In short, Wolff had an opportunity to and did cross-examine Ms. Nettesheim

2   regarding the factors she found relevant in her analysis and presented his own

3   expert to the jury. The jury's decision to find the three (3) corrective disclosure

4   dates is supported by the law and evidence.

5   ## C.   Plaintiff Established Reliance

6   Wolff's argument that lead Plaintiff CalSTRS did not rely on the integrity of

7   the market when making its investment decisions is not supported by the record

8   and is a red-herring. Evidence regarding Plaintiff's individual reliance is

9   irrelevant. Under the fraud-on-the-market doctrine, reliance is presumed when the

10  statements at issue become public. The public information is reflected in the

11  market price of the security. Then it can be assumed that an investor who buys or

12  sells stock at the market price relies upon the statement. *Basic Inc. v. Levinson*,

13  485 U.S. 224, 247 (1988).[4] Ms. Nettesheim's testimony established, and the jury

14  found, that the Homestore stock traded in an efficient market. Sterrett Decl.,

15  Exh. 1, at 83:14-95:11. The jury's finding that Homestore stock traded in an

16  efficient market – which Defendant does not challenge – undercuts his argument.

17  Moreover, Trish Taniguchi's testimony established that CalSTRS relied on

18  the integrity of the market when it purchased stock. Sterrett Decl., Exh. 2, at

19  77:23-78:4. Both investors trading individual stocks and investors trading on an

20  index fund are entitled to rely on the integrity of the market and are entitled to

21  recover damages when fraud is committed on the market. *See Basic, Inc. v.*

22

23

24  [4]   Issues of reliance can be established on a class basis. As stated in *Schaefer v. Overland Exp. Family of Funds*, 169 F.R.D. 124, 131 (S.D. Cal. 1996), the presence of different methods of reliance by different members of the class does

25  not result in a conclusion that individual issues predominate over the common questions. *See also Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 252

26  (D.N.J.1992) ("'In cases involving securities fraud, predominance may be found if the defendant's challenged activities stem from a single, class-wide course of

27  conduct, so that the issue of statutory liability is common to the class . . . .'" (quoting Friedenthal, Kane, Miller, Civil Procedure at 735 (1985)); *see also In re*

28  *ZZZZ Best Sec. Litig.*, 864 F. Supp. 960, 973 (C.D. Cal. 1994) (J. Lew).

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

*Levinson*, 485 U.S. 224, 246 (1987) quoting *Schlanger v. Four-Phase System, Inc.*, 555 F. Supp. 535, 538 (S.D.N.Y 1982) ("It has been noted that 'it is hard to imagine that there is ever a buyer or seller who does not rely on market integrity, who would knowingly roll the dice in a crooked craps game'"). CalSTRS' right to recovery should be upheld.

### D.   The Record Establishes That Wolff Made False Or Misleading Statements

#### 1.   The Jury's Findings Regarding Statements 11 and 12 Are Supported By The Evidence

The jury's finding with respect to Challenged Statements Nos. 11 and 12 is supported by the totality of the evidence presented at trial. There was sufficient evidence to support the jury's finding that Wolff made and controlled the making of misstatements with respect to Homestore's 2000 business activities.

The fact that Wolff admitted in his plea agreement that he committed securities fraud in the year 2001, supports the jury's finding that the fraud started at an earlier period of time: massive frauds do not spring up overnight.

Further, the evidence at trial supports the conclusion that Mr. Wolff was aware of the fraud in the year 2000. Former Homestore CFO John Giesecke testified that: Mr. Wolff set revenue targets higher each quarter and "those number started ratcheting up very quickly." Yet the company's "organic business" (legitimate growth) "was not growing at that same rate." Sterrett Decl., Exh. 3, at 103:10-104:7. So to meet these goals, in 2000 the company started entering into a series of what Mr. Giesecke called "**low-quality**" "**front ended**" revenue deals. Sterrett Decl., Exh. 3, at 68:11-69:3. Mr. Giesecke made clear that the genesis of the low quality deals was to cover goals that could not be reached through the company's "organic and normal business practices." Sterrett Decl., Exh. 3, at 68:11-16. Mr. Giesecke also testified, as did Mr. Shew and Tafeen, that **Wolff was aware of these low-quality deals**. Sterrett Decl., Exh. 3, 51:1-8. As Mr.

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)                 11

Giesecke explained, in 2000, Wolff was reaching in "all different directions trying to make good on the forecast and expectations" he set for Homestore.  Sterrett Decl., Exh.3, at 70:23-71:5. Giesecke also testified the transactions simply "did not jive" with the company's business plan.  *Id*.

Likewise, Joe Shew, Homestore's former CFO, describes the"round-trippers and back and forth deals" entered into the company in 2000 as simply a method of "**buying revenue**."  Sterrett Decl., Exh. 4, at 112:11-113:2.  Shew describes this revenue generated from the back and forth deals as "**naked revenue**."  He also testified that as early as Q3 2000, nearly 50% of the advertising revenue was "**not good clean cash revenue**."  Sterrett Decl., Exh. 4, at 184:03-185:04.  Joe Shew's testimony also establishes Wolff's knowledge of the fraud:

> Well, even in 2000, you know, there were transactions that Peter's group was doing that were just not very good business transactions. We were giving away a lot of functionality and service, and receiving very little, but where a multi-year deal, three or four-year deal, you would expect a certain amount of revenue to be generated over the life of that relationship. . . . And it was a crap deal. There were many of these things. **And I went to Stuart about it, discussed it with him on numerous occasions, and he basically told me to mind my own business, that he and Peter were the Michael Jordans, and you know, they were the offensive players. And I was the Dennis Rodman and my team was the -- we were rebounders. We watched the expense side.  You know, it was his business . . . . And that ultimately it was Stuart's decision to do those deals.**

Sterrett Decl., Exh. 4, at 64:20-66:4.  Consistent with this testimony, Joe Shew detailed Wolff's involvement in the BofA "Insertion Order" that allowed the

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)          12

company to misrepresent the company's revenue numbers for the fourth quarter of 2001.  See Sterrett Decl., Exh. 4, at 422:3-436:06.

Mr. Tafeen's testimony is consistent with Mr. Giesecke's and Shew's account of the fraud that occurred at Homestore in 2000.  Tafeen testified that the "sole purpose" of the back and forth deals entered into by the company in 2000 was to generate revenue.  Sterrett Decl., Exh. 5, at 64:17-24.  Tafeen also testified that Wolff knew about the "back and forth transactions" entered into the company in 2000:

> Q.   And did you ever speak with Mr. Wolff about Homestore's back and forth transactions?
>
> A.   Yes.
>
> Q.   Do you recall when?
>
> A.   During -- you know -- I mean, during the time frame that I was employed, obviously, but not the exact dates, no.
>
> Q.   Was it quite often?
>
> A.   Um -- it was as often as, you know, the deals presented themselves.

Sterrett Decl., Exh. 5, at 63:25-64:24.

Furthermore, the evidence showed that Wolff was aware of a series of "back and forth transactions" in the year 2000 designed to buy revenue, *i.e.* to misrepresent the company's growth.  Mr. Wolff was aware of the fraud occurring in 2000; Mr. Gisecke testified that Wolff was getting in "pretty deep" without going through it thoroughly with finance.  Sterrett Decl., Exh. 3, at 97:25-99:12.

In short, the record fully supports the jury's finding that Wolff made false and misleading statements, with the requisite scienter, regarding the company's advertising revenue for the year 2000.  The court should reject Wolff's self-serving citation to the record.

/ / /

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)                    13

### 2.    The Jury's Findings Regarding Statements 17, 18 and 21 Are Supported By The Evidence

The jury's finding that Wolff made false and misleading statements in the third quarter of 2001 is supported by the record.  First, the evidence showed that Wolff admitted to making a series of false statements earlier in the year (*see* Sterrett Decl., Exh. 12, Trial Exhibit 2189 – Wolff's Plea Agreement), and then continued to tout the fraudulent numbers – that he admitted he knew were false – in statements regarding the companies Q3 2001 revenue.  Homestore's 2001 SEC Form 10-Q Q3 incorporated the fraudulent numbers Wolff admittedly misrepresented in the previous quarters:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2001 | 2000 | 2001 | 2000 |
| Revenues | $116,135 | $ 86,859 | $363,656 | $216,874 |
| Net loss | (106,604) | (89,870) | (273,276) | (282,322) |
| Net loss per share: | | | | |
| Basic and diluted | $ (.96) | $ (.87) | $ (2.55) | $ (2.81) |
| Weighted average shares | 110,476 | 103,427 | 108,022 | 100,476 |

Sterrett Decl., Exh. 14, Trial Exhibit 2106, at 2106_0006.

Further, Wolff admitted that fraud occurred in Q3 2001:

Q.    Was there anything wrong or inappropriate in the first quarter 2001 10-Q?

A.    Yes.

Q.    Was there anything wrong or inappropriate in the second quarter 10-Q?

A.    Yes.

Q.    **Was there anything wrong or inappropriate in the third quarter 2001 10-Q?**

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)          14

A.   **I believe so.**

Sterrett Decl., Exh. 6, at 19:12-20.

Further, Joe Shew's testimony establishes that Stuart knowingly made misrepresentations regarding the company's third quarter revenue.  Shew's testimony details the Wolff's desperate attempts to continue the fraud:

> The house of cards is coming tumbling down. This was a last-ditch
> effort.  We even had scenarios that I recall meeting with John
> Giesecke, Stuart Wolff, myself, Jeff Kalina in the Finance conference
> room where we took up -- it's a wall-talker, they call it. It is an entire
> wall of white board.  And we charted out effectively the scenarios
> that we needed to go through to make the quarter and survive
> thereafter. We needed to lay off over a thousand people. We needed
> to raise money. We needed to buy profitable companies that had a
> decent revenue. In other words, we weren't looking for a little 3 or $5
> million acquisition. We were looking for hundred million dollar
> companies that made 5 or $10 million on the bottom line. We charted
> out these scenarios.  I believe there was two or three scenarios up on
> the white board in the finance conference room, and walked through
> the probabilities of successfully pulling this off.

Sterrett Decl., Exh. 4, at 929:6-930:3.  Ultimately, despite the fact that Wolff knew the company was not going to meet its revenue projections, Wolff reaffirmed guidance on September 6, 2001.  Sterrett Decl., Exh. 4 at 930:7-8; Exh. 13, Trial Exhibit 2079.

In his attempt to avoid liability, Wolff cites testimony from Allan Merrill, who testified that he perceived Wolff as being "surprised[5]" about the companies

---

[5]   Wolff was "surprised" just like Captain Renault in Casablanca.  *See* Youtube.com, The Captain Louis Renault Award, http://www.youtube.com/watch?v=T1DEG6BWgp0. (Captain Renault: "I'm

LAW OFFICES
COTCHETT,
PITRE, &
MCCARTHY, LLP

**PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)**                    15

"problematic transactions."  The jury, of course, was free to disregard this testimony, especially given that Wolff admittedly lied to his board, investors, and the SEC.  Further, Peter Tafeen's testimony directly undercuts Wolff's assertion that he was not aware of the illegality of several of the fraudulent transactions entered into the company in the third quarter of 2001.  Sterrett Decl., Exh. 5, at 113:3-114:4.   Finally, Wolff's assertion that he took measures to correct the fraud is not supported by his own testimony:

> Q:    [Y]ou had entered into an agreement with other senior Homestore executives to improperly record this advertising revenue, correct?
>
> A:    Yes.
>
> Q:    And did you tell that to the attorney and the accountant that you had entered into this agreement to improperly record advertising revenue?
>
> A:    Once again, I don't view it as a formal agreement, and ***I didn't tell them that I had entered into an agreement at that point***.

Sterrett Decl., Exh. 7, at 196:4-13(emphasis added); 238: 3-6 (Wolff admits that he did not have any conversations with lawyers where he disclosed that he made false statements to the SEC).

Joe Hanauer, a board member at Homestore in 2001, also testified that Wolff did not disclose his involvement in the fraudulent scheme:

> Q.    And during those meetings did Mr. Wolff ever tell you that he entered into an agreement to improperly record Homestore's advertising revenue?
>
> A.    No.
>
> Q.    Did he ever tell you that he'd signed 10-Qs that contained false and misleading information while he was the CEO at Homestore?

---

shocked, shocked to find that gambling is going on in here!" The croupier hands Renault a pile of money. Croupier: "Your winnings, sir." Captain Renault: "Oh, thank you very much.")

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

1    A.    No.

2  Sterrett Decl., Exh. 8, at 51:13-23.

3         The jury's finding that Wolff made false and misleading statements in the

4  third quarter of 2001 is supported by the totality of the evidence.

5  **E.    There Is Sufficient Evidence to Establish Wolff's 20(a) Liability**

6         Finally, Wolff asserts there was insufficient evidence to support the jury's

7  finding that he was a "control person" under section 20(a) of the Securities Act.  A

8  violation of section 20(a) is established where there is: (1) a primary violation of

9  federal securities laws; and (2) the Defendant exercised actual power or control

10 over the primary violator.  *Howard v Systems, Inc*., 228 F. 3d 1057 (9th Cir. 2000)

11 (citation omitted).

12        The totality of the evidence presented at trial shows that Wolff exercised

13 control over those employees who the jury found violated securities law.  While

14 Wolff might not have prepared the financial statements, he controlled the people

15 who did and exercised control over the financial information put into the

16 company's financial statements.  At trial, Peter Tafeen testified that Wolff was a

17 very hands-on micro-manager:

18        Q.    How would you describe Mr. Wolff's management style at

19              Homestore?

20        A.    He was very hands-on.

21                          * * *

22        Q.    Would you describe him as a micro-manager?

23        A.    Yes.

24 Sterrett Decl., Exh. 5, at 56:22-57:4.

25        Mr. Giesecke testified that Wolff was a hands-on manager, involved in all

26 details of the business:

27        Q.    How would you describe Stuart's management style?

28 / / /

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)                    17

A.   Hands-on.  Stuart was very involved in all the details . . . he was very involved in any major business decision at the company, and many that weren't major, you know. So, you know, he was -- *he wanted the control*. He had at one time, I don't know, 15 or 16 people reporting to him for goodness sakes.  I mean, you know, he wanted to keep a tight feel and finger on how the business was being run. And that's the way he worked.  And if you made a decision or you did something without his input, he would let you know about it pretty quick.

Sterrett Decl., Exh. 3, at 66:11-67:2 (emphasis added).

Mr. Shew's testimony confirms the fact that Wolff was involved in the decisions made by accounting:

He [Wolff] was very intimately involved with the finance process, if you will, which included budgets . . .  Stuart was very involved in that process helping to set goals in terms of where revenues should be, where earnings per share should be as well as getting into detailed discussions with individual managers and their departments. . . .We would go through line-by-line the marketing budget with myself, John Giesecke, usually two, three, four representatives from Finance, and then the Marketing representatives as well, usually the senior person.

Sterrett Decl., Exh. 4, at 62:20-63:13.

Joe Shew also testified that Stuart not only was aware of that the company was entering into illegal transactions, but ordered his subordinates to execute the fraud:

I basically said, 'Well, we have got to be careful with these transactions because we have to document them in a certain way in order to get revenue.' I went into a discussion on barter revenue . . . .
I told them that we needed a cash transaction in order to support that

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)          18

barter transaction. We got into a little bit of minutia in detail. And

Stuart just said, "**Stop. Get Peter what he needs and let's move on.**"

Being the CEO, I stopped and moved on and we went into a

discussion on Cendant.

Sterrett Decl., Exh. 4, at 274:8-275:8.  Finally, Wolff admitted that he was the

ultimate authority at Homestore.  Sterrett Decl., Exh. 7, at 234:15-235:12.

This evidence confirms that the jury's finding that Stuart Wolff was a

control person with respect to the several of misstatements in this case.

**III.   CONCLUSION**

For the forgoing reasons and based upon the totality of the evidence

introduced at trial, Plaintiff respectfully requests that Wolff's request for a

judgment as a matter of law be denied.

Dated: March 30, 2011              **COTCHETT, PITRE & McCARTHY, LLP**

By:____*/s/ Nancy L. Fineman*_____
               NANCY L. FINEMAN

*Counsel for Lead Plaintiff CalSTRS
and the Class*

LAW OFFICES
COTCHETT,
PITRE, &
McCARTHY, LLP

PLAINTIFF CALIFORNIA STATE TEACHER RETIREMENT SYSTEMS' OPPOSITION TO STUART
WOLFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR PARTIAL
JUDGMENT AS A MATTER OF LAW; Case No. 01-cv-11115 RSWL (CWx)                    19